UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

ESTATE OF EZRA SCHWARTZ, RUTH          :
SCHWARTZ, ARI SCHWARTZ, MOLLIE         :
SCHWARTZ, HILLEL SCHWARTZ, ELON        :
SCHWARTZ, AVI SCHWARTZ, MICHAEL        :
BENZAKEIN, BETTY BENZAKEIN, RALPH      :     **Civil No. 25-cv-9630**
BENZAKEIN, JACQUES BENZAKEIN,          :
SABRINA BENZAKEIN, LEAH                :
BENZAKEIN, JASON GELLER, SANDRA        :     **COMPLAINT**
GELLER, MARC GELLER, JACQUELINE        :
GELLER, ESTATE OF EITAM HENKIN,        :     **JURY TRIAL DEMANDED**
ESTATE OF NAAMA HENKIN, MATAN          :
HENKIN, N.Y.H., a minor, by his guardians ad :
litem YOAV ARMONI and DAVID            :
JACKSON, N.E.H., a minor, by his guardians :
ad litem YOAV ARMONI and DAVID         :
JACKSON, I.Z.H., a minor, by his guardians ad :
litem YOAV ARMONI and DAVID            :
JACKSON,                               :
                                       :
                Plaintiffs,            :
                                       :
-against-                              :
                                       :
QATAR CHARITY and BANK OF              :
PALESTINE,                             :
                                       :
                Defendants.            :
_____


        Plaintiffs Estate of Ezra Schwartz, Ruth Schwartz, Ari Schwartz, Mollie Schwartz, Hillel

Schwartz, Elon Schwartz, Avi Schwartz, Michael Benzakein, Betty Benzakein, Ralph Benzakein,

Jacques Benzakein, Sabrina Benzakein, Leah Benzakein, Jason Geller, Sandra Geller, Marc Geller,

Jacqueline Geller, Estate of Eitam Henkin, Estate of Naama Henkin, Matan Henkin, N.Y.H.,

N.E.H., I.Z.H., by their attorneys, allege the following:

## NATURE OF THE ACTION

1.     Plaintiffs Estate of Ezra Schwartz, Ruth Schwartz, Ari Schwartz, Mollie Schwartz, Hillel Schwartz, Elon Schwartz, Avi Schwartz, Michael Benzakein, Betty Benzakein, Ralph Benzakein, Jacques Benzakein, Sabrina Benzakein, Leah Benzakein, Jason Geller, Sandra Geller, Marc Geller, Jacqueline Geller, Estate of Eitam Henkin, Estate of Naama Henkin, Matan Henkin, and Eitam and Naama Henkin's three minor children, N.Y.H., N.E.H., and I.Z.H. by their guardians Yoav Armoni and David Jackson, (collectively, "Plaintiffs"), bring this Complaint pursuant to 18 U.S.C. § 2333(d) of the Anti-Terrorism Act ("ATA") as amended by the Justice Against Sponsors of Terrorism Act ("JASTA") against (1) Qatar Charity, a purported charitable organization headquartered in Doha, Qatar, and (2) Bank of Palestine ("BOP"), a bank headquartered in Ramallah, Palestinian Territories.

2.     Plaintiffs allege that Defendants aided and abetted the Islamic Resistance Movement ("HAMAS"), a designated Foreign Terrorist Organization ("FTO") that murdered and injured Plaintiffs, by knowingly and systematically providing HAMAS with substantial assistance from at least 2009 through 2018. Specifically, Qatar Charity, an Israeli-designated terrorist organization that was part of the Union of Good (itself an umbrella fundraising organization designated by the U.S. government as a Specially Designated Global Terrorist ("SDGT") in 2008 and as an "Unlawful Association" by Israel in 2002), knowingly donated millions of dollars to HAMAS, including payments specifically made to families of deceased terrorists ("martyrs").

3.     BOP aided and abetted HAMAS by providing essential and illegal banking services to Qatar Charity with actual knowledge that: Qatar Charity was financing HAMAS; Qatar Charity's activities supported HAMAS terrorism; and many of Qatar Charity's beneficiaries were core HAMAS institutions.

4.      BOP also knowingly helped Qatar Charity launder terror funds and conceal them from U.S. law enforcement and regulatory agencies.

5.      To evade detection from U.S. authorities and divert the attention of Israeli intelligence, Qatar Charity transferred millions of euros from its headquarters in Doha to its BOP accounts in the Palestinian Territories.

6.      BOP deposited those euros, converted them for Qatar Charity into U.S. dollars through its own accounts, and then transferred those dollars to HAMAS institutions or loaded them onto dollar-denominated gift cards called "Sanabel cards," knowing these were an untraceable form of cash distribution system. Both Defendants acted with full awareness of HAMAS's violent activities and their own roles in facilitating HAMAS's terrorist attacks, including the attacks that killed and injured Plaintiffs.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333(a) and 2338, as a civil action brought by nationals of the United States and the survivors of a national of the United States who were killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (d) and 18 U.S.C. § 2334(a).

9.      BOP is subject to personal jurisdiction in the State of New York pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k)(1), or in the alternative, Fed. R. Civ. P. 4(k)(2), because it used correspondent bank accounts in New York to, *inter alia*, convert Qatar Charity's funds from euros to U.S. dollars, knowing those funds were intended for HAMAS,

and knowing that the conversion was intended to conceal terror financing from U.S. law enforcement and regulatory agencies.[1]

10.    Qatar Charity is subject to personal jurisdiction in the State of New York pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k)(1), or in the alternative, Fed. R. Civ. P. 4(k)(2), because it conspired with BOP to conceal terror financing from U.S. law enforcement and regulatory agencies by transferring funds in euros to BOP and having BOP then convert those euros to U.S. dollars using its correspondent accounts in New York to cover the currency exchanges.

11.    BOP aided and abetted HAMAS by knowingly providing essential banking services to Qatar Charity, a designated terrorist organization. From 2009-2015, BOP maintained Qatar Charity's accounts, processed millions of euros for Qatar Charity which it deliberately converted into U.S. dollars with the help and use of its U.S. correspondent bank accounts, facilitated payments to HAMAS institutions in the Palestinian Territories, and issued thousands of anonymous "Sanabel Cards," including to HAMAS terrorists and their families. These banking services substantially assisted HAMAS's terrorist activities.

---

[1]    A correspondent bank is a financial institution that creates and maintains accounts for other financial institutions. The bank maintaining the account uses it to make deposits and payments and to engage in other financial transactions, particularly those requiring currency conversion. Correspondent banks can act as intermediaries between banks in different countries and relieve foreign banks of the need to establish a physical presence in other jurisdictions, such as the United States. Foreign banks often use correspondent banks in the United States to access the U.S. financial system and to conduct U.S. dollar-denominated transactions. Frequently, those transactions involve the exchange of currencies or transfers made in currencies other than the account holder's domestic currency.

## PARTIES

A.    **The Plaintiffs**

**The Schwartz Family**

12.    **Estate of Ezra Schwartz**. Ezra Schwartz, a U.S. national, was killed in a terrorist attack perpetrated by HAMAS on November 19, 2015 ("the Schwartz Attack"). The Estate of Ezra Schwartz brings its claims through its legal representatives—Ruth Schwartz and Ari Schwartz.

13.    **Ruth Schwartz**, a U.S. national, is a resident of the State of Massachusetts. She is the mother of Ezra Schwartz.

14.    **Ari Schwartz**, a U.S. national, is a resident of the State of Massachusetts. He is the father of Ezra Schwartz.

15.    **Mollie Schwartz**, a U.S. national, is a resident of the District of Columbia. She is the sister of Ezra Schwartz.

16.    **Hillel Schwartz**, a U.S. national, is a resident of the State of Massachusetts. He is the brother of Ezra Schwartz.

17.    **Elon Schwartz**, a U.S. national, is a resident of the State of Massachusetts. He is the brother of Ezra Schwartz.

18.    **Avi Schwartz**, a U.S. national, is a resident of the State of Massachusetts. He is the brother of Ezra Schwartz.

19.    As described more fully below, during the Schwartz Attack, Ezra Schwartz, Michael Benzakein, and Jason Geller were traveling together in a van to perform a community service project when a member of HAMAS opened fire with an automatic submachine gun. Ezra was struck by bullets and died at the scene; Michael and Jason were injured.

20.    The school where Ezra had been studying in Israel called his father, Plaintiff Ari Schwartz, and told him that Ezra had been shot.

21.     Ari did not know immediately that Ezra had died. He called his wife and Ezra's mother, Plaintiff Ruth Schwartz, and told her what he knew.

22.     Later that day, Ari and Ruth learned that Ezra had been killed in the Schwartz Attack.

23.     Ari observed Ruth sobbing and screaming. When Ari went to the school where his three sons, Plaintiffs Hillel Schwartz, Elon Schwartz, and Avi Schwartz, attended, and told them that Ezra had been killed, the four of them lay on the floor sobbing and hugging each other.

24.     Ezra's body was sent home to the United States, and the Schwartz family buried him there.

25.     Ruth always remembers the trauma of the day that Ezra was killed. She thinks about Ezra every day. She cries about him daily, and he is never far from her thoughts. Ezra's absence has affected all components of her life.

26.     The pain of Ezra's absence has not lessened for Ari over time; he has just tried to live with the tragic reality. He thinks about Ezra constantly, and he cries about him nearly every day. Ari knows that he will never be the same person that he was before Ezra's tragic death.

27.     Ezra's sister, Plaintiff Mollie Schwartz, who describes loving Ezra more than she loves herself, sought psychological counseling to deal with the mental anguish she suffered as a result of Ezra's murder.

28.     Ezra's three brothers, Hillel Schwartz, Elon Schwartz, and Avi Schwartz, saw social workers and attended a bereavement group to deal with the mental anguish they suffered as a result of Ezra's murder.

29.     Hillel always looked up to Ezra as his role model, and the day Ezra was killed was the worst day of his life. He still cries about Ezra and misses him all of the time.

30.     Elon misses the emotional support he used to receive from Ezra. Ezra's death profoundly affected Elon and the way that he looks at the world.

31.     Avi had a very close relationship with Ezra. Avi looked up to Ezra and wanted to be like him. Ezra's death caused Avi a great deal of anxiety. He has become hyperaware of perceived danger and terrorism. Avi thinks about Ezra all of the time.

32.     As a direct and foreseeable result of the Schwartz Attack, Plaintiffs Ruth Schwartz, Ari Schwartz, Mollie Schwartz, Hillel Schwartz, Elon Schwartz, and Avi Schwartz have experienced severe mental anguish, extreme emotional distress, bereavement and grief, and the loss of their son's/brother's society, companionship, comfort, protection, attention, advice, and counsel. As the legal representatives of the Estate of Ezra Schwartz, Ruth Schwartz and Ari Schwartz also bring claims for the economic losses suffered by the Estate as a direct and foreseeable result of the Schwartz Attack.

### The Benzakein Family

33.     **Michael Benzakein**, a U.S. national, is a resident of the State of New York.

34.     **Betty Benzakein**, a U.S. national, is a resident of the State of New York. She is the mother of Michael Benzakein.

35.     **Ralph Benzakein**, a U.S. national, is a resident of the State of New York. He is the father of Michael Benzakein.

36.     **Jacques Benzakein**, a U.S. national, is a resident of the State of Israel. He is the brother of Michael Benzakein.

37.     **Sabrina Benzakein**, a U.S. national, is a resident of the State of New York. She is the sister of Michael Benzakein.

38.    **Leah Benzakein**, a U.S. national, is a resident of the State of New York. She is the sister of Michael Benzakein.

39.    Plaintiff Michael Benzakein heard what sounded like rocks hitting a metal shed and then realized that someone was shooting at the van. He was terrified and texted his family, "I love you."

40.    Michael thought that he was going to die.

41.    Michael saw that Ezra had fallen over and that there was a tremendous amount of blood near his head.

42.    Michael was hit by flying glass, which lodged in his knee.

43.    He was taken to Shaare Tzedek Hospital in Jerusalem, where he was examined, glass was removed from his knee, and his wounds were treated.

44.    When the Benzakein family received the group text from Michael that said, "I love you," Michael's father, Plaintiff Ralph Benzakein, found the message odd and unsuccessfully attempted many times to contact Michael.

45.    After finally contacting Michael, Ralph was informed by Michael that Ezra had been shot and that he thought Ezra had been killed. Then the phone went dead.

46.    Only later that day did Ralph and his wife, Plaintiff Betty Benzakein, learn further information about the Schwartz Attack.

47.    As a result of the Schwartz Attack, Michael saw a trauma specialist – a psychologist – on four occasions.

48.    Michael was unable to attend the engineering program that he had been accepted to because his emotional injuries caused by the Schwartz Attack made it too difficult for him to concentrate. He enrolled instead in an associate degree program at a community college.

49.    Michael has also become more easily startled since the attack, does not like being in crowded areas, and has developed a temper he did not have beforehand. He has difficulty sleeping and experiences nightmares.

50.    As a direct and foreseeable result of the Schwartz Attack, Plaintiff Michael Benzakein sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

51.    In the period after Betty learned that Michael had been involved in a terrorist attack but did not know if he had been shot or not, she felt immense anxiety.

52.    After Betty learned what had happened and spoke to Michael, she immediately observed fundamental changes in Michael – he was noticeably curt and irritable. After Michael came home, Betty saw that Michael had trouble sleeping, experienced nightmares, and was irritable. The effects of the attack have had profound effects on Betty, including making her feel anxious and affecting her sleep.

53.    Ralph too has observed the aforementioned changes in Michael since the attack, including his impatience and anger. He also saw that Michael's sleep was materially affected for many months if not years after the attack.

54.    Plaintiff Jacques Benzakein initially took Michael's new behavior personally, until he received confirmation from others in their family that Michael had indeed changed as a result of the attack. Jacques took care to walk on eggshells around Michael for years until their relationship became less fraught, but he is saddened when he witnesses how Michael's relationship with their parents has changed.

55.     Plaintiff Sabrina Benzakein's relationship with Michael was negatively affected because of the attack. They were particularly close before the attack, but since the attack, Michael's impatience and temper have complicated their relationship.

56.     Plaintiff Leah Benzakein had a close relationship with Michael before the attack. Leah observed the fundamental changes to Michael after the attack described above and has not had the same type of relationship she had with him beforehand.

57.     As a direct and foreseeable result of the Schwartz Attack that injured Michael Benzakein, Plaintiffs Betty Benzakein, Ralph Benzakein, Jacques Benzakein, Sabrina Benzakein, and Leah Benzakein have experienced severe mental anguish and extreme emotional distress.

### The Geller Family

58.     **Jason Geller**, a U.S. national, is a resident of the State of New York.

59.     **Sandra Geller**, a U.S. national, is a resident of the State of New York. She is the mother of Jason Geller.

60.     **Marc Geller**, a U.S. national, is a resident of the State of New York. He is the father of Jason Geller.

61.     **Jacqueline Geller**, a U.S. national, is a resident of the State of New York. She is the sister of Jason Geller.

62.     Plaintiff Jason Geller heard what he thought were rocks being thrown at the van. Someone in the van was yelling, "Get down, get down."

63.     Jason saw the window near Ezra explode and smelled gunpowder.

64.     Jason was hit by flying glass, which lodged in his neck and knee.

65.     Jason tried to attend to Ezra after Ezra was shot but saw that Ezra had lost a lot of blood and feared that he had died.

66.    Jason called his father, Plaintiff Marc Geller, but he did not pick up the phone, so Jason texted him, "Pick up NOW." After Marc did so, Jason told him what had happened.

67.    Jason was taken to Shaare Tzedek Hospital where he was examined, glass was removed from his neck and knee, and his wounds were treated.

68.    Plaintiff Sandra Geller learned from her husband Marc about the attack.

69.    Jason experienced emotional distress and saw a trauma specialist – a psychologist – weekly for one month and subsequently once every six months.

70.    Marc realized that he had suppressed some anger as a result of Jason being injured in the attack and harbors some anxiety about Jason's future wellbeing.

71.    Sandra observed anger in Jason that she had not observed before the attack. Sandra was saddened by Jason's lessened religious observance after the attack, and she experiences concern about his future safety.

72.    Plaintiff Jacqueline Geller still feels the effects of the attack to this day, including experiencing sadness and anger. These emotions intensify around the anniversary of the attack.

73.    As a direct and foreseeable result of the Schwartz Attack, Plaintiff Jason Geller sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

74.    As a direct and foreseeable result of the Schwartz Attack that injured Jason Geller, Plaintiffs Sandra Geller, Marc Geller, and Jacqueline Geller have experienced severe mental anguish and extreme emotional distress.

75.    Each Schwartz, Benzakein and Geller Plaintiff was a United States national at all relevant times, including at the time of the Schwartz Attack alleged herein.

**The Henkin Family**

76.     **Estate of Eitam Henkin**. Eitam Henkin, a U.S. national, was killed in a terrorist attack perpetrated by HAMAS on October 1, 2015 ("the Henkin Attack"). The Estate of Eitam Henkin brings its claims through its court-appointed personal representatives—Yoav Armoni and David Jackson.

77.     **Estate of Naama Henkin**. Naama Henkin, Eitam Henkin's wife, was also killed in the Henkin Attack. Because Naama Henkin was not a U.S. national, her estate, through its court-appointed personal representatives Yoav Armoni and David Jackson, brings claims for Naama's extreme emotional distress resulting from her husband's murder.

78.     None of the four Henkin children identified below are U.S. nationals. The minor children's guardians *ad litem* bring claims on behalf of those minor children for the losses they incurred as a result of their father's murder.

79.     **Matan Henkin** is the son of Eitam and Naama Henkin. Matan was a minor at the time of the attack and has since reached the age of majority.

80.     **N.Y.H.**, a minor, is the son of Eitam and Naama Henkin. N.Y.H.'s claims are brought by his guardians *ad litem*, Yoav Armoni and David Jackson.

81.     **N.E.H.**, a minor, is the son of Eitam and Naama Henkin. N.E.H.'s claims are brought by his guardians *ad litem*, Yoav Armoni and David Jackson.

82.     **I.Z.H.**, a minor, is the son of Eitam and Naama Henkin. I.Z.H.'s claims are brought by his guardians *ad litem*, Yoav Armoni and David Jackson.

83.     As described more fully below, Eitam and Naama Henkin were murdered by HAMAS gunmen who forcibly stopped their vehicle on the road. The gunmen fired at the family vehicle hitting Eitam, who pulled the vehicle over. After a struggle, the gunmen killed Eitam in

front of Naama and then killed Naama. All four children were minors at the time—nine years old, seven years old, four years old, and ten months old, respectively—and were subject to, and witnessed, the attack.

84.    Eitam was shot, then assaulted, and then murdered. Before he was murdered, he would have feared that the terrorists would murder—or abduct—his wife and four children.

85.    Naama saw her husband shot, assaulted, and murdered. Before she was murdered, she too would have feared that the terrorists would murder—or abduct—the four children.

86.    The four Henkin children will bear the psychological and emotional scars of this attack for the rest of their lives.

87.    After the attack, the children remained in the car slumped over in their seats, fearful for their lives. The two older children recited the Jewish prayer *Shema Yisrael*, which is said, among other times, when a Jewish person anticipates imminent death. After the terrorists left, the children sat in the dark with their parents' bloodied and lifeless bodies. When a passerby later discovered the car, he suspected that attackers were still near and so "shot several shots in the air" to scare them away. When authorities finally did arrive, the first child to speak was N.Y.H., who asked whether they were now orphans.

88.    Three of the four Henkin children are still minors; all are under the care of mental health professionals as they attempt to cope with the traumatic and tragic loss of their parents. They have been uprooted from their prior home and town and now live with Naama's parents, who were both working at the time of Eitam's and Naama's murder, and who have now retired early to devote themselves full time to raising and nurturing their four grandchildren.

89.    As a direct and foreseeable result of the Henkin Attack, Naama and the four Henkin children have experienced severe mental anguish and extreme emotional distress.

### B.     The Defendants

90.     Qatar Charity is a purported charitable organization headquartered in Doha, Qatar. Qatar Charity was established in 1984 as the "Committee of Qatar for Orphan Sponsorship" and was officially registered as Qatar Charity in 1992 under Qatari law. Throughout its existence, Qatar Charity has knowingly and actively funded foreign terrorist organizations, including HAMAS.[2]

91.     Bank of Palestine is a financial institution incorporated under Palestinian law with its principal place of business in Ramallah, Palestinian Territories. BOP was founded in 1960 and is one of the largest banks operating in the Palestinian Territories, with branches throughout the West Bank and Gaza Strip.

92.     During all relevant times, BOP maintained correspondent banking relationships with financial institutions in New York, through which it conducted U.S. dollar-denominated transactions. BOP's correspondent banking relationships enabled it to maintain dollar-denominated accounts for Qatar Charity and convert euros sent by Qatar Charity into U.S. dollars destined for Qatar Charity's accounts at BOP in the Palestinian Territories.

93.     These correspondent banking relationships were essential to BOP's ability to convert international wire transfers denominated in euros into U.S. dollars.

94.     However, correspondent bank accounts are subject to regulatory scrutiny in the countries where they are maintained. In the United States, correspondent banks are required to block and/or report suspicious transactions. This obligation inhibits terror financiers like Qatar

---

[2]     Media reporting has shown that Qatar Charity has been "accused of providing financial support to terrorism in Syria and Yemen," Sawsan al Shaer, *Iran-Qatar Rapprochement and Fueling of Terrorism*, ALARABIYA.NET (July 24, 2017); and "significantly financing the terrorists in northern Mali" and an al-Qaida affiliate "in the Islamic Maghreb [Northern Africa]," *Qatar's Insidious Influence on the Brookings Institution*, LEGAL MONITOR WORLDWIDE (Oct. 29, 2014). According to Congressional testimony from Prof. Daveed Gartenstein-Ross, "[t]he Syrian Islamic Front, "considered one of the key jihadist elements," in Syria, received support from IHH and Qatar Charity." State of Al-Qaeda; Committee: House Armed Services (Feb. 4, 2014).

Charity from routing their funds transfers denominated in U.S. dollars, especially to high-risk jurisdictions like the Palestinian Territories.

95.     Qatar Charity was able to bypass the usual scrutiny performed by U.S. correspondent banks by transferring funds to the Palestinian Territories in euros (minor currencies are too hard to convert and are subject to price fluctuations); however, euros are not used in commerce in the Palestinian Territories whereas U.S. dollars are.

96.     Thus, for Qatar Charity's strategy to work it needed a local financial institution that was willing to (a) maintain one or more U.S. dollar-denominated accounts for it, (b) accept large transfers in euros, (c) convert those euros into U.S. dollars using its correspondent bank accounts to cover the exchange, and (d) work with Qatar Charity to facilitate further U.S. dollar-denominated transfers to HAMAS institutions and issuing gift cards funded by Qatar Charity that supported Hamas operatives and their families. That bank was BOP.

## FACTUAL ALLEGATIONS

## I.     THE NOVEMBER 19, 2015, ACT OF INTERNATIONAL TERRORISM

97.     On November 19, 2015, Ezra Schwartz and Plaintiffs Michael Benzakein and Jason Geller were riding in a passenger van on their way to deliver care packages to Israeli soldiers and to beautify a park in honor of three Israeli boys who had been kidnapped and murdered in 2014. Ezra, Michael, and Jason were in Israel studying for the year before they started college in the United States.

98.     The van they were traveling in passed through Gush Etzion Junction, where it encountered traffic and was forced to slow down.

99.     Muhammad Abd al-Basset Odeh al-Harub, a member of HAMAS from Hebron, was driving a car looking for a place to commit a terror attack near Gush Etzion Junction, which is located near a large Jewish community. Al-Harub wanted to kill as many Jews as he could.

100.    The long-term planning al-Harub employed was manifested by the fact that on two occasions before the Schwartz Attack, he planned other terrorist attacks, though he did not follow through for various reasons. These planned attempts reflected his longstanding intention to commit the Schwartz Attack.

101.    Moreover, al-Harub purchased the Uzi that he used in the Schwartz Attack nine months before he perpetrated it.

102.    Al-Harub also regularly maintained his weapons and practiced shooting them, a level of professionalism characteristic of members of terror cells who operate within organizational frameworks as opposed to individuals unaffiliated with terrorist groups who spontaneously commit terrorist attacks.

103.    When al-Harub reached Gush Etzion Junction on November 19, 2015, however, he saw only a few Jews, so he headed west toward the Jewish communities of the Gush Etzion region.[3]

104.    Finding no suitable target there, al-Harub turned back toward Gush Etzion Junction.

105.    When he arrived at Gush Etzion Junction, there was traffic; as a result, vehicles in the area were moving slowly. Al-Harub seized the opportunity and opened fire with an Uzi automatic submachine gun, spraying the surrounding vehicles and their passengers with bullets.

106.    Al-Harub emptied three magazines, constituting 75 bullets, and used his car to ram other vehicles before being apprehended.

107.    By the time the Schwartz Attack was over, three people, including Ezra, had been killed, and nine others, including Michael and Jason, had been injured.

---

[3]    Al-Harub selected the attack date in part because it was the anniversary of the death of Sheikh Izz al-Din al-Qassam, the namesake of the Izz al-Din al-Qassam Brigades, HAMAS's operational terrorist wing.

108.    HAMAS publicized its appreciation for al-Harub in a series of posts on Twitter, including on November 21, 2015, two days after the Schwartz Attack,[4] "blessing the operation" in a post featuring al-Harub's picture and HAMAS's logo:



"Blessing the operation carried out by Muhammad Abdul Basit al-Haroub in Gush Etzion last Thursday, which resulted in the killing of 2 settlers."

109.    On February 24, 2016, in a press release on HAMAS's official website, senior HAMAS official Abd al-Rahman Shadid called on "the people in the Hebron area to support the famil[y] of the prisoner[] Muhammad Abd al-Basset al-Harub …, whose home[] the occupation forces destroyed the day before."[5]

110.    Shadid indicated that "the hero[] al-Harub [is an] excellent symbol[] of Hamas movement's operatives, who pay the precious price for the liberation of their land," and emphasized that "Hamas will continue to lead the way to Palestine's liberation."

---

4       See https://twitter.com/paldf/status/667967030402883584 (Nov. 21, 2015).

5       See http://hamas.ps/ar/post/4969.

111.    HAMAS posters explicitly stating that al-Harub was a Qassam Brigade operative, HAMAS's operational terrorist wing (the posters referred to al-Harub as "the Qassami prisoner"), were displayed at al-Harub's home on February 23, 2016. The posters made clear publicly and openly that the perpetrator of the Schwartz Attack, al-Harub, was an operative of HAMAS's military operational wing.

112.    On November 30, 2020, the District Court for the District of Columbia found that "Hamas was responsible for the November 19 attack." *Schwartz v. Islamic Republic of Iran*, No. 18-cv-01349 (RDM) (D.D.C.), ECF No. 29 at 18.

## II.    THE OCTOBER 1, 2015, ACT OF INTERNATIONAL TERRORISM

113.    On the evening of October 1, 2015, Eitam Henkin (a U.S. national), his wife Naama Henkin, and their four then-minor children, Matan Henkin (who has since reached the age of majority), N.Y.H., N.E.H. and I.Z.H. (collectively, "the Henkin Family"), were driving south in the West Bank near Nablus on Route 555 when their car was overtaken by another vehicle containing three HAMAS gunmen: Karam Lutfi Fathi Rizq al-Masri ("Karam Rizq"), Yahya Muhammed Naif Abdallah Haj Hamed ("Haj Hamad"), and Samir Zuheir Ibrahim Kusa ("Samir Kusa").

114.    The three attackers were members of an operational terror cell from the Qassam Brigades, HAMAS's operational terrorist wing.

115.    A fourth member of the operational terror cell, Ziyad Amer, served as a lookout, confirming for the three attackers that the road was clear of Israeli security forces.

116.     The cell's leader, Ragheb Aliwa, did not participate directly in the attack, but was responsible for recruiting, training, providing logistics for the terror cell, and communicating with a command echelon of four additional senior HAMAS operatives.[6]

117.     Haj Hamad leaned out of his window and sprayed automatic gunfire from an M16 at the Henkin Family, hitting Eitam, who was forced to pull the car over to the side of the road.

118.     Karam Rizq and Haj Hamad immediately exited their vehicle, while Samir Kusa remained behind the wheel.

119.     The terror cell's objective was to kidnap an Israeli citizen.

120.     Haj Hamad and Karam Rizq approached the vehicle—Haj Hamad carrying an M16 on the passenger side, where Naama sat, and Karam Rizq carrying a handgun on the driver's side.

121.     Karam Rizq opened the driver's side door.

122.     Although he was wounded by the initial gunfire, Eitam bravely attempted to defend his family by struggling with Karam Rizq.

123.     Haj Hamad approached the passenger side of the vehicle and opened it as Karam Rizq and Eitam began to struggle over Karam Rizq's weapon.

124.     Haj Hamad then fired at Eitam with his M16, killing him and inadvertently wounding Karam Rizq, before shooting Naama at point blank range and killing her.

125.     The four Henkin children, then ages nine, seven, four, and ten months witnessed their parents' murders from the backseat of the car.

126.     With Karam Rizq wounded, the attackers retreated from the scene.

127.     Karam Rizq was hospitalized in Nablus, where he was arrested on October 4, 2015.

---

[6]     The members of the command echelon were Bassam a-Sayih, Iyad Abu Zahra, Amjad Aliwi, and Muhammad al-Qutub.

128.    By October 5, 2015, Israeli security forces had arrested all five members of the operational terror cell.

129.    On October 5, 2015, the Israel Security Agency issued a report naming the five members of the operational terror cell, describing the attack, and concluding that HAMAS was responsible for it.[7]

130.    Israeli security forces also arrested the four members of the cell's command echelon, each of whom had prior convictions for HAMAS membership.[8]

131.    Eight of the nine aforementioned HAMAS members implicated in the attack were convicted for their participation in the attack and for membership in HAMAS. The ninth, the lookout Zayed Amer, has been charged, but has not yet been tried because certain matters are on appeal. He has been remanded to custody.

132.    HAMAS has claimed responsibility for the attack, which it refers to as the Itamar attack or operation, a reference to an Israeli settlement located near the attack.

133.    The day after the attack, HAMAS's official website praised the attack.[9]

---

[7]    Archived at https://web.archive.org/web/20200920211326/https://www.shabak.gov.il/publications/Pages/NewItem61015.aspx.

[8]    Bassam a-Sayih was active in HAMAS since the 1990s and was arrested numerous times in connection with terrorist activity. He was convicted for his role in the Henkin Attack – obtaining the funds, weapons, and various authorizations needed for the attack – and for being a HAMAS operative since at least 2004. He died of cancer in prison before he could be sentenced for his role in the attack. After his death, HAMAS eulogized him as a field commander for the Qassam Brigades and as a "shahid," *i.e.*, a martyr, who was responsible for the Itamar terror attack against the Henkins. Iyad Abu Zahra served two prior prison sentences for HAMAS activity and was previously convicted of HAMAS membership. After his release from prison, he was visited publicly by HAMAS representatives from the Palestinian Legislative Council, which is indicative of how important he was to HAMAS. Amjad Aliwi was previously convicted multiple times as a HAMAS operative. Muhammad al-Qutub was previously convicted in 2007 of membership in HAMAS and of attempting to establish a terror cell for the purpose of planting a bomb.

[9]    Archived at https://web.archive.org/web/20151002190731/https://hamas.ps/ar/post/3706/.

134.    In another post, HAMAS's website referred to the attack as a "harvest of resistance," a reference to HAMAS's name, the Islamic Resistance Movement.[10]

135.    On June 23, 2016, one day after four of the terrorists (Amjad Alawi, Haj Hamad, Karam Rizq, and Samir Kusa) were convicted and sentenced to two life sentences plus 30 years, the Qassam Brigades website quoted HAMAS's spokesman Husam Badran: "The sons of the Hamas movement are the ones who carried out the Itamar Operation." The website shows pictures of the terrorists arrayed above the scene of the Henkin Attack, including the Henkins' vehicle and Eitam's and Naama's bodies, which are pixelated in the photograph[11]:



136.    On October 1, 2016, the one-year anniversary of the Henkin Attack, the Qassam Brigades official website celebrated the attack as "Itamar Revenge," naming the attackers, and embedding a video of Israeli news coverage of the attack.[12]

---

[10]    https://hamas.ps/ar/post/3723/حصاد-المقاومة-مقتل-إسرائيلي-بن-وإصابة-17-آخرين-خلال-أسبوع-بالضفة.

[11]    Ezzedeen Alqassam Brigades, *Badran: The perpetrators of the "Itamar" Operation Will Get Away With An Honorable Deal* (June 23, 2016), https://www.alqassam.ps/arabic/news/details/10367.

[12]    Ezzedeen Alqassam Brigades, *The Qassam Brigades' "Itamar" Operation: The Spark of The Uprising and the Force of Revenge* (Oct. 1, 2016), https://alqassam.ps/arabic/news/details/10948.

137.    On July 12, 2021, the District Court for the District of Columbia found that "the October 1, 2015, terrorist attack in which Eitam and Na'ama Henkin were murdered was committed by Hamas." *Henkin v. Islamic Rep. of Iran*, No. 19-cv-01184 (RCL), ECF No. 61 ¶ 148.

## III.    THE ISLAMIC RESISTANCE MOVEMENT ("HAMAS")

### A.    HAMAS's Founding

138.    Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably HAMAS, a radical Islamist terrorist organization committed to the globalization of Islam through violent "jihad" (holy war) and the destruction of the State of Israel.

139.    HAMAS[13] was established in the Gaza Strip on December 10, 1987, shortly following the outbreak of the First Intifada.[14] HAMAS announced its founding in an "official" communiqué on December 14, 1987.

140.    HAMAS represented the culmination of approximately 15 years of preparation and organization building, led by Ahmed Yassin (known as "Sheikh Yassin"), the unrivaled leader of what had been the Muslim Brotherhood Movement in the Gaza Strip.[15]

141.    Although Yassin had been confined to a wheelchair throughout his adult life, he worked unceasingly for the establishment of HAMAS in the Gaza Strip. When HAMAS was established in Yassin's home in 1987, the Islamic Resistance Movement already had a defined ideology and a group of pre-existing institutions in Gaza, such as *Al-Mujama Al-Islami* (the Islamic

---

[13]    HAMAS is an acronym of the Arabic "*Harakat al-Muqawama al-Islamiya*"—Islamic Resistance Movement—but its name also means, in Arabic, enthusiasm, courage, and zeal for battle.

[14]    The term "First Intifada," as used herein, refers to the violent conflict that broke out in December 1987 between the Palestinians and Israel. Although it has no official ending date, it is generally considered to have concluded with the signing of the Oslo Accords in September 1993.

[15]    The Muslim Brotherhood Movement was established in Egypt in 1928 by Hassan al-Banna and was dedicated to fighting Western influences on Muslim society; ensuring the adherence of Muslims to Islamic law (Shari'a); and, following the rectification of Muslim society, eventually establishing an Islamic state that would expand its rule over the world by means of jihad and a call to join Islam.

Center), *Al-Jam'iya Al-Islamiya* (the Islamic Society), and the Islamic University of Gaza that were the flagship institutions of the Muslim Brotherhood's civilian social framework—the *da'wa*.[16]

142. On December 10, 1987, after violence broke out in the Jabalia Refugee Camp, Sheikh Yassin invited six of the leaders of the Muslim Brotherhood in Gaza to his home.

143. There the group decided on the establishment of HAMAS, a terrorist organization that would combine terror against Israel with its *da'wa* activities, through *Al-Mujama Al-Islami*, *Al-Jam'iya Al-Islamiya*, and the Islamic University of Gaza.

144. In 1973, Yassin had established *Al-Mujama Al-Islami*, and in 1976, he had formed *Al-Jam'iya Al-Islamiya.*

145. The two organizations, which were based in Gaza, quickly expanded and established branches throughout the Gaza Strip, but neither of them was, at the time of its establishment, *openly* militant.

146. Initially, the two organizations primarily centered their activities on mosques, which were not meant solely for prayer. They also served as centers for social, educational, cultural, and political activity, while enjoying a measure of extra-territorial immunity that derived from their religious nature.[17]

---

[16]    The word "*da'wa*," whose basic meaning in Arabic is "the call to the believers to shelter beneath the faith – return to the faith," is used herein to refer to HAMAS's civilian infrastructure that fundamentally supports its violent (terrorist) operations.

[17]    Yassin and the Muslim Brotherhood did not accept the secular Palestine Liberation Organization ("PLO") as the sole official representative of the Palestinian people, and subsequently began challenging representatives of PLO organizations in the trade unions, charitable societies, and universities in Gaza and the West Bank. In Gaza, where Yassin's leadership was more aggressive, the Muslim Brotherhood gradually seized control of the Islamic University of Gaza (founded in 1978) by removing members of the university's PLO-affiliated administration and replacing them with members of *Al-Mujama Al-Islami*.

147.    HAMAS considers the seven participants in the December 1987 meeting its founding fathers. All of them were members of the Muslim Brotherhood, and six of them were members of *Al-Mujama Al-Islami*: Sheikh Yassin, Salah Shehada,[18] Abd al-Aziz al-Rantisi, Muhammad Sham'a, Ibrahim al-Yazuri, Issa al-Nashar, and Abd al-Fatah Dukhan.

148.    At the meeting, Sheikh Yassin was recognized as the supreme leader of HAMAS.

149.    His six associates in founding the movement became HAMAS's leadership council, and each of them was appointed to head a particular region of the Gaza Strip: Salah Shehada was responsible for the northern Gaza Strip; Abd al-Aziz al-Rantisi was responsible for the Khan Yunis area; Muhammad Sham'a was put in charge of Shati Refugee Camp; Ibrahim al-Yazuri was put in charge of Gaza City; Issa al-Nashar was put in charge of the Rafah area; and Abd al-Fatah Dukhan was put in charge of the central camps (four refugee camps).

150.    All seven of HAMAS's founders were members of the *da'wa* apparatus (the civilian infrastructure of the Muslim Brotherhood and later of HAMAS).

151.    In a February 1, 1988, article titled "Islam's Voice in Gaza," *Time Magazine* wrote about Sheikh Yassin and his obvious connection to the Islamic Center in Gaza:

> Sheik Yasin, 51, is a spiritual leader of the Islamic fundamentalist movement in Gaza and thus a prime force behind the religious gale that has recently fanned the flames of unrest in the occupied territories. Born in the Arab village of Al-Joura, Sheik Yasin has been paralyzed below the neck since age 15 as the result of an athletic accident. He resides with his wife and eleven children in a one-story house in Gaza City. Family members assist him in dressing and eating. Despite his handicap, he runs al-Mujama al-Islami, a community organization that builds mosques and sponsors cultural activities.

---

[18]    Shehada was not a member of *Al-Mujama Al-Islami*.

152.    In a January 1998 interview with a HAMAS publication, Ibrahim al-Yazuri, one of the aforementioned founders of HAMAS, offered a telling description of HAMAS's philosophy regarding charitable giving:

> Everyone knows that the Islamic Resistance Movement, HAMAS, is a Palestinian Jihad movement that strives for the liberation of all Palestine, from the (Mediterranean) sea to the river (Jordan), from the north to the south, from the tyrannical Israeli occupation, and this is the main part of its concern. Social work is carried out in support of this aim, and it is considered to be part of the HAMAS movement's strategy.... The HAMAS movement is concerned about its individuals and its elements, especially those who engage in the blessed jihad against the hateful Israeli occupation, since they are subjected to detention or martyrdom. The movement takes care of their families and their children and provides them with as much material and moral support as it can. This is one of the fundamental truths of Islamic work and thus represents the duties of the Islamic state.... The movement provides this aid through the support and assistance it gives to the zakat (Islamic alms-giving) committees and the Islamic associations and institutions in the Gaza Strip.

153.    As indicated above, years before HAMAS was established, Sheikh Yassin and the Muslim Brotherhood in the Gaza Strip had developed the civilian infrastructure (such as *Al-Mujama Al-Islami*, *Al-Jam'iya Al-Islamiya,* the Islamic University of Gaza, and other organizations) which would soon form the backbone and recruiting grounds for HAMAS's Qassam Brigades.[19]

154.    In January 1988, HAMAS also established a branch in the West Bank, through three of the leaders of the Muslim Brotherhood there: Jamil Hamami, Hamed Bitawi and Sa'id Bilal. As in the past, HAMAS relied on the Muslim Brotherhood's infrastructure to build HAMAS's backbone of command and resources, while absorbing key charitable societies (such

---

[19]    In 1984, the IDF uncovered a weapons cache in Yassin's house. He was later arrested and convicted of "establishing a radical Islamic religious organization whose aim was to destroy the State of Israel and replace it with a religious Islamic state." He was sentenced to 13 years in prison but was released a year later on May 21, 1985, as part of the "Jibril Prisoners' Exchange."

as *Al-Mujama Al-Islami* and *Al-Jam'iya Al-Islamiya*) in Gaza and zakat committees[20] in the West Bank, and, where necessary, also setting up new institutions.

### B.    HAMAS in the 1990s

155.    In December 1992, because of HAMAS's increased terrorist activity, the Government of Israel deported more than 350 HAMAS operatives to Lebanon.

156.    This step later became known as the *Marj al-Zuhur* Deportation because the deported Islamists were delivered to a checkpoint by that name in southern Lebanon during their brief exile.

157.    The *Marj al-Zuhur* Deportation was a formative moment in HAMAS's history and mythology. It established its status as a leading Palestinian political organization and brought it to prominence in the Arab and international arenas.

158.    HAMAS members who were deported to *Marj al-Zuhur* have a special place in HAMAS's history. They quickly became the most iconic members of HAMAS and later emerged as key leaders of its *da'wa* and the backbone of its leadership.

159.    The international community condemned the deportations, and at the end of 1993, the Israeli Supreme Court determined that the Government of Israel was required to return the *Marj al-Zuhur* deportees.

160.    On September 13, 1993, President Clinton hosted the signing ceremony in Washington, D.C. for the so-called "Oslo Accords" agreed to by the Palestine Liberation Organization ("PLO"), represented by Chairman Yasser Arafat, and Israel, represented by Prime Minister Yitzhak Rabin and his foreign minister, Shimon Peres.

---

[20]    The term "zakat" means tithing in Arabic. This is one of the five Pillars of Islam (Arkan al-Islam).

161.    The agreement had several significant aspects, including the withdrawal of Israeli forces from parts of the West Bank and Gaza, and the creation of the Palestinian National Authority ("PA"), headed by Chairman Arafat.

162.    Under the agreement, the newly formed PA would perform the services previously provided by Israel, including education, health, social welfare, taxation, and tourism, in Gaza and the West Bank.

163.    The agreement also included Mutual Recognition, whereby the Israeli Government recognized the PLO as the legitimate representative of the Palestinian people, while the PLO recognized the right of Israel to exist and purportedly renounced terrorism, violence, and the desire for the destruction of the State of Israel.

164.    The Oslo Accords were not, however, universally accepted by the Palestinian factions.

165.    For example, HAMAS rejected the agreement because of its recognition of Israel's right to exist.

166.    For HAMAS, the Oslo Accords contradicted its most valued tenets—the destruction of the State of Israel and the creation of an Islamic state in all of what is today Israel, the West Bank, and the Gaza Strip.

167.    Accordingly, HAMAS pursued a three-pronged strategy in the early 1990s.

168.    First, it upgraded its terror apparatus, improving the capabilities of its Qassam Brigades and beginning to perfect its bomb-making skills.

169.    Second, it intensified its efforts to subvert existing social welfare institutions—particularly in the West Bank—in order to systematically gain control of pre-existing charitable societies, zakat committees, and other religious and social institutions that would ultimately

compete with the PA for the "hearts and minds" of the Palestinian public in Gaza, the West Bank, and even the Palestinian refugee camps in Jordan and Lebanon.

170.    Third, it accelerated the development of its world-wide fundraising network. While HAMAS enjoyed support from wealthy patrons in the Persian Gulf, even in its prior incarnation as Sheikh Yassin's Muslim Brotherhood "branch" in Gaza, the Oslo Accords galvanized the Muslim Brotherhood's supporters in Europe, Africa, and even the United States.

171.    HAMAS fundraisers and other operatives located abroad are key members of HAMAS's *da'wa*, closely tied to Qassam Brigades operatives on the ground in the West Bank and the Gaza Strip, as well as to HAMAS political leaders in Turkey, Qatar, and elsewhere in the Middle East.

172.    In 1992, it was decided that Israel's Civil Administration in Judea and Samaria and Gaza, and not the Israel Security Agency ("ISA") would be the main entity responsible for monitoring HAMAS's *da'wa* in the Palestinian Territories.

### C.    Early Media Coverage of HAMAS's *Da'wa*

173.    As early as 1994, HAMAS fundraising activities were discussed in the media. For example, an article in *The New York Times* reported:

> HAMAS funding of all its activities is estimated by the Israelis at about $30 million a year. It comes from money collected by associations operating largely abroad but with ties to the international Muslim Brotherhood network. Money is also collected from Islamic and Arab communities in the United States and in Britain, the Netherlands and other Western European locations.

174.    Also, on April 14, 1994, *The Globe and Mail* (Canada) published an article titled, "Hamas evolves from political to military group" by Patrick Martin.

175.    The article explained HAMAS's *da'wa* in straightforward terms and identified its best-known institution:

> The group calling itself Hamas first made its appearance in 1987, at the start of the Palestinian uprising known as the intifada. Concentrated in Gaza, where Islamic tendencies have always been strong, it stemmed from a decade-old Islamic movement known as the Mujamma…. Sheik Yassin, who had been an activist in the older Muslim Brotherhood, had been imprisoned by the Egyptians during the regime of Gamal Nasser. When the Mujamma turned into the political movement Hamas, Sheik Yassin was again arrested, this time by the Israelis.

176.    In 1995, the Civil Administration became increasingly alarmed by the growth and increased strength of HAMAS's *da'wa* and the increased flow of funds coming from abroad through the Palestinian banking system to various HAMAS controlled institutions in Gaza and the West Bank, particularly zakat committees and Islamic charitable societies.

177.    At first, the Civil Administration decided to broach the subject with, among others, various bank managers who regularly visited the various branch offices of the Civil Administration situated in the West Bank and brief them on HAMAS's takeover of many zakat committees and Islamic associations in their communities, but it was subsequently decided (also in 1995) that a more senior officer inside the Office of the Advisor for Arab Affairs in the Civil Administration should brief the senior management of the three largest banks operating in the region.

178.    In 1996, *The New York Times* reported on HAMAS's intensified fundraising for its network of institutions:

> Israeli, Palestinian and Western intelligence officials say Jordan is a major conduit for much of the Hamas budget, estimated at $70 million a year, nearly all of it for the social service network of mosques, hospitals, schools and other institutions that form the movement's political base in the West Bank and Gaza Strip.
>
> …Jordan, intelligence officials say, is a major path through which money reaches the Hamas network of mosques and charities. Jordanian intelligence reports indicate that much of the money is coming from the Persian Gulf emirates and Saudi Arabia.

179.    In 1997, following a May 6, 1997, series of Israeli designations directed against the Holy Land Foundation[21] and other HAMAS fundraising organizations, the Counter-Terrorism Bureau of the Israeli Prime Minister's Office decided to dispatch the head of its counter-terrorism financing efforts to directly warn the senior leadership of the largest financial institutions situated in the West Bank (including BOP) concerning HAMAS's takeover of many zakat committees and Islamic associations in their communities, such as the Islamic Charitable Society of Hebron ("ICSH"), *Al-Mujama Al-Islami* (the Islamic Center) in Gaza, *Al-Jam'iya Al-Islamiya* (the Islamic Society) in Gaza and the fact that the banks (including BOP) were assisting HAMAS's terrorist activities by collecting and distributing funds that the many HAMAS-controlled zakat committees and Islamic associations were routing through their banks.

180.    But the senior management of the three largest banks operating in the region, including BOP, continued assisting HAMAS.

181.    On September 17, 1997, the British-based *Mideast Mirror* published an article titled "How to break the deadlock: Armed resistance, plus Arab pressure on U.S."

182.    The article quotes the Arabic press regarding Gulf State sources of funding for HAMAS:

> According to al-Hayat's sources, only some $10 million dollars is raised annually by Palestinian Islamist charities in the Gulf, most of which is paid directly to visiting fund-raising delegations or the charities' bank accounts in Jordan, or via Palestinian support groups based in the U.S. or Britain.
>
> Gulf-based charities also say they make a point of ensuring that recipients are recognized by the Jordanian religious affairs ministry or the PA's Jerusalem-based religious affairs department. They include the Zakat (alms) Committees in Hebron, Jerusalem, Tulkarem, Kalkilya and Gaza, which fund schools, Koran teaching classes and orphanages, provide cash or food

---

[21]    The Holy Land Foundation was a notorious Texas-based Hamas fundraiser. The United States designated it an SDGT in 2001, then prosecuted it and its leadership for terror financing. The prosecution resulted in convictions in 2008, which were upheld by the Fifth Circuit Court of Appeals.

aid to the families of martyrs, and run self-help schemes for needy families. Gulf funding also sustains the Islamic Charitable Society in Hebron, Jerusalem's Makassed Hospital, and the Wafa Society in Gaza which looks after the elderly.

Gulf donors also insist that they have always dealt openly with such organizations, which Israel accuses of constituting the "infrastructure" of Hamas. "We used to work with these organizations in broad daylight in the days of direct Israeli occupation, and continued dealing with them under the PA, though regrettably the pressures increased with the advent of the PA," *al-Hayat* quotes one aid worker as saying.

As for higher educational institutions, the main recipient of Gulf aid is Gaza Islamic University, which has long been described as a "Hamas stronghold."

183.  An August 11, 2001, article in *The Washington Post* reported:

On the streets of Gaza, and to a somewhat lesser extent in the West Bank, Hamas's status has been underpinned by a network of medical clinics, schools and welfare institutions that distribute free and subsidized food to the needy.

According to Yassin, the group distributes $2 million to $3 million in monthly handouts to the relatives of Palestinian suicide bombers; "martyrs" who have been killed by Israelis; and prisoners in Israeli jails. When pressed, he was vague about the provenance of the money, which, according to the State Department, comes mainly from Palestinians overseas, Iran and private benefactors in Saudi Arabia and other moderate Arab states.

### D.    U.S. Designations of HAMAS

184.  On January 23, 1995, President Clinton issued Executive Order No. 12947. President Clinton found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

185.  Executive Order No. 12947 designated HAMAS a Specially Designated Terrorist ("SDT") and blocked all property and interests in property of the terrorist organizations and persons designated in the Order, including HAMAS.

186.    On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). HAMAS's designation as an FTO has been renewed every two years since HAMAS was originally so-designated.

187.    On October 31, 2001, after the September 11, 2001, terrorist attacks on the United States, President Bush issued Executive Order No. 13224, declaring a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States."

188.    Executive Order No. 13224 designated HAMAS a Specially Designated Global Terrorist and blocked all property and interests in property of SDGTs, including HAMAS. HAMAS's designation as an SDGT has remained in place since HAMAS was originally so-designated.

**E.    The Union of Good**

189.    The Union of Good (also known as the Charity Coalition or *I'tilaf Al-Khayr* in Arabic) was established in October 2000, at the beginning of the Second Intifada,[22] as the umbrella organization for HAMAS's global fundraising activity.

190.    Comprising more than 50 separate organizations over the course of its existence—several of which have been designated SDGTs by the U.S. Treasury Department, including HAMAS funders like Interpal and CBSP—the Union of Good originally began as a limited 101-day fundraising drive for emergency aid at the outset of what was later called the Second Intifada,

---

[22]    The term "Second Intifada," as used herein, refers to the violent conflict which broke out at the end of September 2000 between the Palestinians and Israel. Although it has no "official" ending date, it is generally considered to have concluded at the end of 2004.

chaired by the late Sheikh Yusuf al-Qaradawi (discussed further below), the Muslim Brotherhood's spiritual leader.[23]

191.    The 101-day fundraising drive was so successful that the Union of Good was converted into a permanent institution. It quickly became the preeminent Muslim Brotherhood fundraising mechanism in the world, raising tens of millions of dollars for HAMAS.

192.    Qatar Charity was featured as a prominent member organization of the Union of Good on the latter's website,[24] and served as one of the key fundraising entities within this global HAMAS financing network.

193.    In 2001, the Union of Good created an Arabic language website for the 101 Days Campaign, with English and French versions, each soliciting donations.

194.    As of at least August 1, 2001, the official website of HAMAS's political bureau at that time – www.palestine-info.net – posted an advertisement on its home page with a hyperlink to the Union of Good's 101 Days Campaign website:



---

[23]    This information was sufficiently publicly known that even an obscure Virginia news website called "World Tribune" published an article on July 4, 2002, noting Israeli military seizures of records showing that the Saudi Committee for the Support of the Intifada al Quds "transferred money to a network of charities linked to Hamas. They include Al Salah Association in Gaza City, the Islamic Association in Hebron, and the Coalition of Benevolence. The coalition is headed by Yusuf al-Qaradawi, an Egyptian born Sheik who now lives in Qatar."

[24]    Archived at https://web.archive.org/web/20070227160725/http://www.101days.org/arabic/modules.php?name=moassat (last visited Nov. 18, 2025).

195.    On February 25, 2002, the Union of Good was designated by Israel in an order of the Minister of Defense of the State of Israel, based on its being "part of the Hamas organization or supporting it and strengthening its infrastructure."

196.    Having previously designated constituent organizations within the Union of Good, the U.S. Treasury Department designated the Union of Good itself as an SDGT on November 12, 2008. According to the Treasury Department:

> Union of Good acts as a broker for HAMAS by facilitating financial transfers between a web of charitable organizations—including several organizations previously designated under E.O. 13224 for providing support to HAMAS—and HAMAS-controlled organizations in the West Bank and Gaza. The primary purpose of this activity is to strengthen HAMAS' political and military position in the West Bank and Gaza, including by: (i) diverting charitable donations to support HAMAS members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of HAMAS.

> Funds raised by the Union of Good affiliates have been transferred to HAMAS-managed organizations in the West Bank and Gaza. In addition to providing cover for HAMAS financial transfers, some of the funds transferred by the Union of Good have compensated HAMAS terrorists by providing payments to the families of suicide bombers. One of them, the Al-Salah Society, previously identified as a key support node for HAMAS, was designated in August 2007 under E.O. 13224. The Society employed a number of members of the HAMAS military wing and supported HAMAS-affiliated combatants during the first Intifada.

197.    HAMAS leaders have also served openly in the Union of Good's executive leadership. For example, the Secretary General of the Union of Good, Essam Salih Mustafa Yussuf, also acted as the Vice-Chairman of Interpal while serving on HAMAS's executive committee under then-supreme HAMAS leader Khalid Mishal.

198.    In fact, during a conference in Doha, Qatar, on July 16, 2007, then-supreme HAMAS leader Khalid Mishal publicly thanked Sheikh Yusuf al-Qaradawi (in attendance) for his assistance to HAMAS through the Union of Good:

The third point: the Union of Good. One of the blessings of our Sheikh, may Allah reward him is that he supports what he says with acts. His support of the Palestinian people and the Intifada was not in words, positions, and fatwas [religious rulings] only, but also in activities and efforts. He sponsored a big project which is the Union of Good during the Second Intifada – the blessed al-Aqsa Intifada. I do not exaggerate when I say that what the projects of Union of Good provided - the blessed money from the good people of the [Muslim] nation to the steadfast people on the land of Palestine was tens, even hundreds of millions of dollars. I wish that this will be in the Sheikhs balance of good deeds.[25]

199.    Until his death in 2022, Sheikh Yusuf al-Qaradawi was closely associated with the

Union of Good. Al-Qaradawi was one of the Muslim world's most prominent public supporters of

HAMAS and its campaign of violence against Israel. He was one of the most recognized and

famous people in the Arab and Muslim world, and as illustrated below (depicted with an image of

Sheikh Yassin), his image is iconic:[26]



---

[25]    A video clip of a part of the conference featuring Khalid Mishal and Sheikh al-Qaradawi is available at: https://www.memri.org/tv/hamas-leader-khaled-mashal-praises-sheik-yousef-al-qaradhawi-his-support-suicide-operations-and.

[26]    Al-Qaradawi's visit to the Gaza Strip in May 2013 was widely covered in the media, including his meetings with HAMAS's leadership. *See, e.g., Islamic cleric in Gaza rejects Israel's existence*, ASSOCIATED PRESS (May 9, 2013) ("Al-Qaradawi arrived in Gaza late Wednesday to an enthusiastic welcome by Hamas Prime Minister Ismail Haniyeh and his Cabinet ministers.").

200.    When the Union of Good created its initial websites, Sheikh al-Qaradawi's widely recognized image appeared prominently on the homepage, including the English language homepage for www.101days.org in July 2001 depicted below:



201.    Until 2013, al-Qaradawi was best known for his weekly television program on the *Al Jazeera* satellite channel called "Sharia and Life" ("al-Sharīʿa wa al-Ḥayāh"), on which he analyzed numerous topics through the lens of Islamic thought. (The program reached approximately 60 million viewers at its height, before it ended in 2013.)

202.    Al-Qaradawi has long stated that "[t]he martyr operations is [sic] the greatest of all sorts of Jihad in the Cause of Allah."

203.    In 1997, al-Qaradawi participated in a convention marking the tenth anniversary of the founding of HAMAS. He also published a fatwa on the www.islam-online.net website permitting the perpetration of suicide bombing attacks, asserting that: "*istishhad* is not suicide and should not be seen as unfit and endangering the life of the perpetrator… regarding the Palestinians… I believe that those actions are a duty performed in self-defense and [represent] active opposition to violence and injustice."

204.    He also gave HAMAS and other terrorist groups religious approval to commit suicide bombing attacks (including by women) against Israel.

36

205. In 1998, even before the Second Intifada erupted in 2000, Sheikh al-Qaradawi was a leading voice in Arab and Islamic politics endorsing violence against Israel, publicly asserting, for example, that: "There should be no dialogue with these people [Israelis] except with swords."[27]

206. During 2001, on his *Shariah and Life* broadcast on *Al Jazeera*, Sheikh al-Qaradawi was asked what could be done to show the Palestinian people that there were people standing by them. He replied:

> No doubt there are steps that need to be taken at the official and popular level… There is another thing: Financial Jihad. Our brethren are struggling for money. They are sacrificing themselves. They are giving martyrs every day. Thank God this means that the Umma is giving martyrs. Women cry for joy at the death of the martyrs… We should give aid to our brethren to reinforce their steadfastness, to try and overcome the blockade enforced on them.

207. Later in the interview, Sheikh al-Qaradawi answered further questions about the duties of Muslims regarding the conflict with Israel, and he said:

> We should resist and resist with what we have. We do not have nuclear weapons… I am surprised at any Muslim who calls these acts "suicide acts." These are martyrdom, commando and heroic acts. We should hail those who carry out these acts and bless them and call on God to take them to live in Paradise. They are there, God willing, because of their intentions, works, efforts and Jihad.

208. In an interview in the Egyptian newspaper *Al-Ahram Al-Arabi* on February 3, 2001, al-Qaradawi explained his ruling:

> He who commits suicide kills himself for his own benefit, while he who commits martyrdom sacrifices himself for the sake of his religion and his nation. While someone who commits suicide has lost hope with himself and with the spirit of Allah, the Mujahid is full of hope with regard to Allah's spirit and mercy. He fights his enemy and the enemy of Allah with this new weapon, which destiny has put in the hands of the weak, so that they would fight against the evil of the strong and arrogant. The Mujahid becomes a 'human bomb' that blows up at a specific place and time, in the midst of the

---

[27] *See* "Leading Muslim Cleric Under Fire for Meeting Israeli Chief Rabbi," *AP Worldstream*, January 7, 1998, quoting a January 6, 1998, article by al-Qaradawi in the Arab newspaper *Al-Shaab*.

> enemies of Allah and the homeland, leaving them helpless in the face of the brave Shahid who ... sold his soul to Allah, and sought the Shahada [Martyrdom] for the sake of Allah.

209.    In an April 25, 2001, interview with a Qatari newspaper, *Al-Raya*, al-Qaradawi further explained that suicide bombings against targets in Israel "are the supreme form of Jihad for the sake of Allah, and a type of terrorism that is allowed by the Shari'a." He cited a Koranic verse stating that one must be prepared to "spread fear among one's enemies and the enemies of Allah," and added that "the term 'suicide operations' is an incorrect and misleading term, because these are heroic operations of martyrdom, and have nothing to do with suicide. The mentality of those who carry them out has nothing to do with the mentality of someone who commits suicide."[28]

210.    On June 2, 2001, *Agence France Presse* reported that Sheikh al-Qaradawi criticized Sheikh Sayyid Tantawi for disapproving of suicide bombing, quoting al-Qaradawi as saying on May 12, 2001: "These martyr operations led by the Palestinian fighters against Israel spring from resistance and all Muslims who kill to defend their land, honour and religion are martyrs."

211.    In an op-ed in *The Guardian* on August 28, 2001, Faisal Bodi wrote: "The world's most quoted independent Islamic jurist, Sheikh Yusuf al-Qaradawi, calls the [suicide] bombs 'commendable' and 'among the greatest form of holy struggle against oppression.'"

212.    On September 16, 2001, al-Qaradawi appeared on *Al Jazeera* Television in Qatar to discuss the September 11, 2001, attacks on the World Trade Center and Pentagon. Striking a note of "moderation" he distinguished the September 11th attacks from those targeting civilians in Israel:

> We must differentiate between two types of terror: the terror of those defending their homeland and their rights… This kind of terror is legitimate.

---

[28]    Also quoted in Michael Slackman, "Islamic Debate Surrounds Mideast Suicide Bombers," *The Los Angeles Times*, May 27, 2001. The *Associated Press* reported that same day that al-Qaradawi had publicly stated that a suicide bombing "is one of the greatest means of struggle."

The Palestinian factions defending their land, such as Fatah, Hamas, or Islamic Jihad, are not terrorists. [It is] a Jihad for the sake of Allah…

Even if the US is guilty, in that it supports this Israeli terror, I say that this does not mean that we may attack civilians in the US, because the civilians are not guilty. We should fight the American military if we can, and if we cannot, we should fight the US economically and politically.

213. The *Associated Press* reported on February 26, 2002, that "Youssef al-Qaradawi, a highly respected Egyptian clergyman, said suicide bombings – themselves a matter of debate among Muslims – are the best form of jihad and that 'what applies to men also applies to women.'"

214. In March 2002, in a HAMAS journal published in Britain called *Filasteen al-Muslama*, al-Qaradawi stated that the participation of women in suicide terrorist attacks is not only permitted but even desirable, and that it is permitted for a woman to deviate from the rules that obligate her in daily life, from the point of view of preserving her modesty, to carry out the suicide attack (for example, in his ruling, al-Qaradawi permits women to travel for the purpose of carrying out the suicide attacks without being escorted by a male relative, and is even lenient in regard to covering her head and wearing a veil).

215. HAMAS often relied on al-Qaradawi's legal rulings in matters of current import and often turned to him to obtain legal rulings.

216. In a May 4, 2002, article published in *Akhbar al-Khaleej* (UAE), al-Qaradawi's lecture (given in the UAE) outlined his view that collecting money for the mujahideen (jihad fighters, or "Muslim holy warriors") was not a donation or a gift, but "a duty necessitated by the sacrifices they made for the Muslim nation."

217. On June 13, 2003, al-Qaradawi appeared on Qatar Television to discuss, among other things, the Bush Administration's efforts to restart negotiations between the Palestinian Authority and Israel. Al-Qaradawi stated:

The Intifada expresses an assertive and proud people, a heroic people, a people that is unperturbed by death. A people that wants to live free, in honor, or die martyred. It is inconceivable that this people will die, despite the attempts of the Zionist entity state and of its strategic ally, the U.S. As much as they try to kill the Intifada and crush the resistance, they will not succeed....

I say to [PA Prime Minister] Mahmoud Abbas, to [PA Security Minister] Muhammad Dahlan, and to the ministers who support them, that the day Hamas and [Islamic] Jihad, Al-Aqsa Martyrs Brigades, and the Mujahideen cease to exist, nothing will remain to negotiate about or to cling to. You will stand in your nakedness. No one will support you. What pushed the Zionists and the Americans to present the road map is the [defeat] they suffered as a result of the martyrdom operations that shook their foundations, undermined their existence, and sowed fear in their hearts.

218. In a July 7, 2004, interview for BBC's "Newsnight," al-Qaradawi, referring to suicide attacks, said: "I consider this type of martyrdom operation as evidence of God's justice."

219. Through al-Qaradawi's role as chairman of the Union of Good, he actively oversaw and coordinated the Union of Good's network of member organizations that raised and transferred funds to HAMAS throughout the world. These member organizations, operating under the Union of Good's umbrella, formed the operational infrastructure through which millions of dollars flowed to HAMAS operatives, HAMAS-controlled institutions, and HAMAS front organizations in the Palestinian Territories.

220. Israel designated Qatar Charity as an unlawful organization in June 2008 specifically because of its association with and membership in the Union of Good. The U.S. Treasury Department similarly recognized Qatar Charity as part of the Union of Good network that Treasury had designated in November 2008 as an organization "created by Hamas leadership to transfer funds" to the terrorist organization. Qatar Charity's membership in the Union of Good was well-documented by multiple international sources, including the Counter Extremism Project,

which maintained detailed databases on extremist organizations and their interconnections, and was publicly acknowledged in various governmental designations and court filings.

221.    Qatar Charity also belongs to the International Islamic Council for Dawa ("IICD"), an organization comprising 86 organizations, many of which are associated with the Muslim Brotherhood, support HAMAS, or fundraise for al-Qaeda. The IICD is headed by Abdullah Omar Naseef, a Saudi leader who served as head of the Muslim World League and founder of the Rabita Trust, an organization designated by the United States and United Nations for al-Qaeda financing shortly after 9/11.

222.    Qatar Charity has also collaborated extensively with the Turkish Humanitarian Relief Foundation ("IHH"), which Israel, Germany, and the Netherlands have designated as a terrorist organization. In 2014, Turkish authorities raided IHH Turkey offices under suspicion of IHH funding al-Qaeda. IHH is also a member of the Union of Good. This was reported widely in the media.[29]

### F.    Qatar's Direct and Systematic Funding of HAMAS

223.    For decades, Qatar has pursued a deliberate policy of financially supporting HAMAS, frequently masking this support as humanitarian charitable contributions.

224.    Following the 2006 elections that resulted in HAMAS ultimately gaining control of Gaza in 2007, Qatar committed $50 million to the Palestinian Authority government then dominated by HAMAS.

---

[29]    *See, e.g.*, Abdullah Bozkurt, *Is Qatar Charity funding al-Qaeda in Turkey?* YEREPOUNI DAILY NEWS (Aug. 28, 2017).

225.    By 2008, the media reported Palestinian officials publicly acknowledging that Qatar was providing HAMAS with monthly payments amounting to millions of dollars, nominally intended for Gaza's population.

226.    Qatar's financial commitment to HAMAS escalated dramatically in October 2012 when it pledged $400 million to the terrorist organization. This massive commitment provoked widespread condemnation from the United States Congress, with two dozen members writing directly to Qatar's ambassador to express their outrage that Qatar's support of "Hamas, a U.S.-designated Foreign Terrorist Organization … legitimizes, and bolsters an organization committed to violence and hatred."

227.    In October 2012, HAMAS Prime Minister Ismail Haniyeh publicly welcomed the Qatari Ambassador Muhammad Ismail al-Imadi and an official delegation "that represents the state as well as the brothers from Qatar who represent the Qatar Charity Society" at a HAMAS government ceremony in Gaza. Haniyeh thanked Qatar "for supporting the legitimate government" (referring to HAMAS) and announced that Qatar was funding projects costing "around one quarter of a billion [currency not identified] and more than this." The presence of both Qatari government officials and Qatar Charity representatives at the same HAMAS government ceremony demonstrates the coordinated nature of Qatar's governmental and purportedly "charitable" support for HAMAS.[30]

228.    Qatar stands as HAMAS's single largest funder. During the six-year period spanning 2012 through 2018, Qatar's officially documented contributions to HAMAS exceeded

---

[30]     "Hamas premier discusses Gaza rule, reconciliation, government challenges," BBC MONITORING MIDDLE EAST—POLITICAL (Oct. 18, 2012) (transcript of speech by Ismail Haniyeh broadcast on Al-Aqsa Satellite TV, Gaza).

$1.1 billion. This figure represents only Qatar's acknowledged transfers and does not account for additional covert financial support provided through entities like Qatar Charity.

229.     In March 2014, David Cohen, who was then serving as Treasury Under Secretary, publicly identified Qatar as operating an exceptionally "permissive jurisdiction" for terrorist financing operations. Cohen specifically emphasized that Qatar "has for many years openly financed Hamas, a group that continues to undermine regional stability."

230.     Cohen further observed that Qatar's regulatory environment was so lax that "several major Qatar-based fundraisers act as local representatives for larger terrorist fundraising networks that are based in Kuwait." Beyond HAMAS, Cohen noted that Qatar was simultaneously supporting extremist organizations conducting operations in Syria.

231.     Qatar's neighboring Arab states recognized the threat posed by Qatar's sponsorship of terrorism. On June 5, 2017, Saudi Arabia, Bahrain, Egypt, and the United Arab Emirates took the extraordinary step of severing all diplomatic relations with Qatar specifically because of Qatar's persistent connections with and support of terrorist organizations.

**G.     Qatar Charity: A Terrorism Support Entity Established by Qatar to Fund HAMAS**

232.     Qatar Charity originated in 1992 under the name Qatar Charitable Society. Within a short time of its establishment, the organization became a primary funding mechanism for international terrorist networks.

233.     After the Qatar Charitable Society became internationally notorious for its role in terrorism financing, the organization attempted to obscure its reputation by renaming itself Qatar Charity. This cosmetic rebranding did nothing to alter the organization's fundamental mission of providing financial support to terrorist organizations.

234.    In March 2008, the U.S. Interagency Intelligence Committee on Terrorism ("IICT"), operating as part of the U.S. National Counterterrorism Center, formally classified Qatar Charity (operating at that time under its former name Qatar Charitable Society) as a "priority III terrorism support entity," or "TSE." This designation was based on the U.S. intelligence community's assessment of Qatar Charity's "intent and willingness" to provide financial support to terrorist organizations actively targeting the United States and its interests.

235.    However, as noted above, Qatar Charity's involvement in financing international terrorism long predated its 2008 classification by U.S. intelligence agencies. Throughout the 1990s and early 2000s, Qatar Charity had established and maintained a consistent pattern of providing financial support to and partnering with terrorist organizations operating across multiple continents.

236.    Qatar Charity routinely made martyr payments for HAMAS terrorists and their family members. These payments served as important incentives to commit terrorist attacks, especially for suicide bombings, as it assured would-be terrorists that their families would be paid if they died while murdering civilians.

237.    Seized records from HAMAS *da'wa* institutions detail various martyr payments Qatar Charity made.

238.    For example, records seized from the Tulkarem Zakat Committee, a well-known HAMAS institution declared an Unlawful Association by the Israeli Minister of Defense on February 25, 2002, as an institution belonging to HAMAS, and by the head of the IDF's Central Command on June 30, 2002, list thousands of dollars in martyr payments made by Qatar Charity.

These records include receipts and thank-you notes from Tulkarem Zakat Committee to Qatar Charity.[31]

239.    For example, on June 9, 2002, Tulkarem Zakat Committee wrote to Qatar Charity, "We are sending you a beneficiary list of martyrs' families who benefited from your aid, amounting to $5000." The records also include, for example, a handwritten thank you note from the mother of suicide bomber Mahmud Ahmad Marmash to Qatar Charity for a martyr payment of $1,548. Marmash blew himself up in an Israeli shopping mall, killing five civilians and wounding more than 100.[32]

240.    These records also include article clippings describing Qatar Charity's martyr payments and other assistance for HAMAS institution.

241.    The major Israeli daily *Israel Hayom* reported on July 31, 2014, that "the US Treasury Department and FBI concluded that the [Qatar Charitable] Society had connections to Al-Qaeda and served as a shell charity company for the terror organization."

242.    Qatar Charity further demonstrated its commitment to financing HAMAS by providing funding to and establishing partnerships with Islamic Relief Worldwide, an organization that Israel banned in 2014 specifically because of its role in funding HAMAS operations.

243.    In July 2008, Israel's Defense Minister issued an official order prohibiting Qatar Charity (still operating at that time under its former name, Qatar Charitable Society) and every one of its branch operations from conducting any activities in territories administered by the Palestinian Authority. This same governmental order officially designated Qatar Charity as a member of the

---

[31]     Tulkarem Zakat Committee's activities included making payments to the families of HAMAS suicide bombers and other terrorists.

[32]     Lee Hockstader, *Bombing Triggers Israeli Airstrikes*, WASH. POST (May 18, 2001).

Union of Good, which Israeli and U.S. authorities had identified as a notorious funder of HAMAS terrorism (indeed, the U.S. designated Union of Good *after*, that is, knowing, Israel had identified Qatar Charity as a member of the organization).

244.    Simultaneously with designating Qatar Charity, Israel issued explicit warnings to financial institutions worldwide. Israel specifically advised all world banking and financial institutions **"to prepare accordingly and act with caution in order to avoid criminal actions and civil lawsuits by victims of terrorism,"** including lawsuits that could be filed in United States courts. This warning put the global banking community, including BOP, on notice that providing services to Qatar Charity could result in civil liability for terrorism financing.

245.    Indeed, at this point, litigation under the Anti-Terrorism Act against Arab Bank, PLC, had been pending for approximately four years, having been filed in 2004 in the Eastern District of New York in the case *Linde v. Arab Bank, PLC*. Arab Bank, headquartered in Amman, Jordan, was one of the largest and most prominent financial institutions operating in the Middle East, with an extensive branch network throughout the Palestinian Territories including the West Bank and Gaza Strip – the same region where BOP operated.

246.    That lawsuit alleged that Arab Bank provided financial services to HAMAS and other terrorist organizations operating in Israel, the West Bank, and Gaza Strip, directly and via HAMAS-controlled zakat committees and charitable societies, and provided financial services to senior terrorist operatives of HAMAS and other terrorist organizations. The lawsuit also alleged that Arab Bank facilitated payments to families of suicide bombers and other terrorists who perpetrated attacks against Israeli and American victims.

247.    The *Linde* litigation involved claims under the ATA arising from the same regional terrorist financing infrastructure that BOP supported by maintaining accounts for Qatar Charity, a

member of the Union of Good umbrella organization that the U.S. Treasury designated in 2008 as having been created by HAMAS leaders specifically to transfer funds to HAMAS.

248.    Qatar Charity distributed funds to the Islamic Charitable Society of Hebron, the Islamic Society in Gaza, and other HAMAS institutions. And BOP directly maintained accounts for the Al-Nur Prisoners Society and other organizations[33] – the same HAMAS-controlled entities and payment networks to which Arab Bank had provided services from 2000-2004, resulting in the 2014 civil liability verdict against Arab Bank. The verdict was widely reported in the media, including in the Middle East.[34] Notably, Arab Bank refused to provide banking services to Qatar Charity itself, apparently finding it too risky to bank despite (or because of) Arab Bank's own documented history of assisting HAMAS.

249.    The then-pending *Linde* case, reported on widely by the international media,[35] further underscored the serious legal risks facing financial institutions that provided banking services to entities financing terrorism in the region, and put BOP on clear notice that such conduct could result in substantial civil liability in United States courts. But it did not dissuade BOP from continuing to provide pervasive assistance to HAMAS.

250.    Even after the 2014 *Linde* verdict finding Arab Bank civilly liable for knowingly providing financial services to HAMAS, BOP *continued* to support the same terrorist financing

---

[33]    The trial evidence described the Union of Good and its constituent fundraising components, which included, e.g., the Holy Land Foundation and Qatar Charity.

[34]    *See, e.g.*, *Central Bank of Jordan release comment regarding Arab Bank legal case*, Mist News (Egypt) (Sept. 23, 2014); Ben Ariel, *Jordan's Central Bank Supports Arab Bank After Verdict on Hamas*, Arutz Sheva (Israel) (Sept. 24, 2014); Joe Palazzolo, *Arab Bank Found Liable for Providing Assistance to Hamas; Jury Verdict a First Against a Bank in a Civil Terrorism-Finance Case*, The Wall Street Journal Online (Sept. 22, 2014).

[35]    *See, e.g.*, Mena Report Reporters, *Central Bank of Jordan Governor Denies Any Involvement of Arab Bank in Financing "Terrorist" Activities*, AL-BAWABA (July 8, 2004); Glenn R. Simpson, *U.S. Terror Victims File Suit Against Jordan's Arab Bank*, WALL ST. J. EUR. (July 7, 2004), at A2; Melissa Radler, *Victims of Palestinian Terror Sue Arab Bank in New York for $875 Million*, JERUSALEM POST (July 7, 2004), at 2; *Terrorist Victims' Families Sue Arab Bank in US*, AGENCE FRANCE PRESSE (July 6, 2004).

infrastructure without interruption. Throughout 2014 and 2015, during and after the highly publicized *Linde* trial and verdict, BOP continued maintaining and servicing Qatar Charity's accounts, processing millions of dollars that Qatar Charity distributed to HAMAS institutions including the Islamic Charitable Society of Hebron and the Islamic Society in Gaza. In fact, during 2015 alone, Qatar Charity moved $28 million to the Palestinian Territories with these transfers flowing through BOP's accounts.

251.    Moreover, BOP maintained accounts for the Al-Nur Prisoners Society from at least 2014 forward, knowing it was a core HAMAS institution, and during the 2014-2015 period, Al-Nur used its BOP accounts to finance Qassam Brigades terror cells and terrorist attacks.

252.    This continued facilitation of the same HAMAS-controlled entities and payment networks that had just resulted in Arab Bank's liability demonstrates that BOP's assistance to Qatar Charity and HAMAS was not only conscious and intentional but that BOP was willing to expose itself to substantial reputational and financial risk in order to assist HAMAS and help it succeed.

253.    As noted above, in November 2008, the U.S. Department of the Treasury officially designated the Union of Good as an SDGT, triggering prohibitions on financial transactions with the organization and any of its members.

254.    Treasury's designation order explicitly stated that the Union of Good constituted "an organization created by Hamas leaders to transfer funds to the terrorist organization." Treasury further emphasized that "the primary purpose of this activity is to strengthen Hamas's political and military position in the West Bank and Gaza, including by: (i) diverting charitable donations to support Hamas members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of Hamas." This official U.S. government finding

established that the Union of Good, of which Qatar Charity was a member, existed for the specific purpose of financing HAMAS.

255.    Treasury's designation particularly highlighted that the Union of Good's purported charitable activities in the West Bank and Gaza included administering so-called "martyr" payments to families of suicide bombers. The Union of Good also systematically promoted terrorism by making direct payments to individuals who had committed terrorist acts and by providing ongoing financial support to families of convicted terrorists serving sentences in Israeli prisons. These payment programs created illegal financial incentives and rewards for committing murder, causing grievous injuries to Plaintiffs and countless other terrorism victims.

256.    Treasury's designation order specifically stated: "In addition to providing cover for Hamas financial transfers, some of the funds transferred by the Union of Good have compensated Hamas terrorists by providing payments to the families of suicide bombers."

257.    Treasury further determined that "Union of Good acts as a broker for Hamas by facilitating financial transfers between a web of charitable organizations ... and Hamas-controlled organizations in the West Bank and Gaza." This finding revealed that the Union of Good, including Qatar Charity, served as the critical financial intermediary connecting international fundraising operations with HAMAS's operational entities on the ground.

258.    Qatar Charity's support for HAMAS extended to deliberate attempts to circumvent Israeli security measures designed to prevent weapons and terrorist financing from reaching Gaza. In December 2008, Qatar Charity publicly announced its intention to ship "aid" to Gaza in an explicit attempt to defy the Israeli blockade that had been imposed after HAMAS violently seized control of the Gaza Strip in June 2007, slaughtering members of the rival Palestinian faction, Fatah.

259.    Abdallah al-Nimaa, Qatar Charity's vice president, told international media that Qatar Charity planned to send a ship carrying medical supplies from Doha to Gaza "in a symbolic gesture" and that the organization did not request an Israeli permit for the shipment. Al-Nimaa acknowledged that he expected "Israeli warships to bar the Qatari aid ship" but stated that Qatar Charity was "determined" to run the blockade.[36]

260.    The close relationship between Qatar Charity and HAMAS was publicly acknowledged by HAMAS leadership. In October 2012, HAMAS's then–Prime Minister Ismail Haniyeh delivered a speech at a government ceremony in Gaza in which he specifically welcomed and thanked representatives "from Qatar who represent the Qatar Charity Society." Haniyeh praised Qatar for its "economic and political support" and specifically thanked "those who led the ship in the midst of difficult and complex circumstances and took it to safe shores after which they handed the banner to righteous men who pursue the road towards Jerusalem and Al-Aqsa and towards Palestine and the liberation of this blessed land and our prisoners from the Zionist occupation jails."[37] "Taking the road towards Jerusalem and Al-Aqsa" is a HAMAS euphemism for destroying Israel and replacing it with an Islamic caliphate, as explicitly set forth in HAMAS's charter.

261.    This public acknowledgment by HAMAS's Prime Minister, which was reported in the media and also broadcast on HAMAS-run Al-Aqsa Satellite Television, demonstrated that Qatar Charity was operating as a direct supporter of HAMAS.

---

[36]    *Qatari charity seeks to defy Gaza blockade*, AGENCE FRANCE-PRESSE (Dec. 1, 2008).

[37]    *Hamas premier discusses Gaza rule, reconciliation, government challenges*, BBC MONITORING MIDDLE EAST—POLITICAL (Oct. 18, 2012) (transcript of speech by Ismail Haniyeh broadcast on Al-Aqsa Satellite TV, Gaza).

262.    Qatar Charity collaborated with the HAMAS-controlled Ministry of Education in Gaza in 2009 to build HAMAS-run schools.[38]

263.    These HAMAS-run schools that Qatar Charity helped build were not ordinary educational institutions. According to reports on Qatari-owned *Al-Jazeera* and multiple other public sources including HAMAS websites, these schools provided military training to students as part of the Al-Futuwwa program.[39]

264.    On January 7, 2014, the HAMAS Ministry of Education announced that 13,000 students would take part in the Al-Futuwwa program that year. Activities included "learning how to load and shoot AK-47 rifles, how to scale buildings using rope and other practical military studies, some involving in the field experience with members of the Izz al-Din al-Qassam Brigade, the military-terrorist wing of Hamas."[40]

265.    Qatar Charity invested millions of dollars into HAMAS infrastructure. For example, Palestinian media outlet *Sama News* reported on January 25, 2017, that Ismail Haniyeh, then-deputy head of HAMAS, intervened after Qatar Charity failed to make $10 million in late

---

[38]    Martin Samuel, *Proof FIFA Gave the World Cup to Sponsors of Terror*, DAILY MAIL (LONDON) (Mar. 24, 2014).

[39]    *See id.* The Al-Futuwwa program has drawn international criticism from child protection organizations because of its use of weapon replicas and mandatory military-style drills during school hours, and its function as a recruitment pipeline funneling children into summer and winter camps run by HAMAS's Qassam Brigades where children underwent weapons training with replica firearms and sometimes live ammunition on military bases near the Israeli border. A 2014 investigation by Defense for Children International - Palestine found strong links between the school-based Al-Futuwwa program and the Qassam Brigades camps, with enrollment doubling from 5,000 children in January 2013 to 13,000 participants from 49 public schools in 2014, and summer camps in 2015 attracting at least 24,000 children, some as young as 12 years old. Defense for Children International - Palestine, *Changes to Gaza's Futuwwa program reduce child protection risks*, (Mar. 6, 2017,) *available at* https://www.dci-palestine.org/changes_to_gaza_s_futuwwa_program_reduce_child_protection_risks.

[40]    Martin Samuel, *Proof FIFA Gave the World Cup to Sponsors of Terror*, DAILY MAIL (LONDON) (Mar. 24, 2014).

payments for its projects in Gaza. Thanks to Haniyeh's intervention, Qatar Charity paid half the amount it owed—$5 million.

266.    In June 2019, Saudi Arabia, Bahrain, Egypt and the UAE officially designated Qatar Charity as a financial supporter of terrorism. This four-nation consensus represented a regional determination by Qatar's Arab neighbors that Qatar Charity posed a significant terrorism financing threat.

### H.    The Mechanics of the Qatar Charity-Bank of Palestine Funding Scheme

267.    Throughout a period spanning from at least 2009 through 2015, Qatar Charity and BOP aided and abetted HAMAS by systematically transferring millions of U.S. dollars to HAMAS operatives and HAMAS-controlled institutions operating in the Palestinian Territories.

268.    Qatar Charity raised funds in Qatar and transferred them to Qatar Charity's accounts at BOP in the Palestinian Territories.

269.    BOP actively assisted HAMAS and Qatar Charity and knowingly provided the essential banking services that enabled Qatar Charity to receive these funds and distribute them to HAMAS.

270.    From 2011 to 2015, Qatar Charity transferred more than $28 million in funds that originated with Qatar Charity in Doha and were transferred to Qatar Charity's two branch operations in the Palestinian Territories (one branch located in Gaza and another in the West Bank).

271.    A substantial portion of these $28 million in transferred funds were ultimately distributed by Qatar Charity to HAMAS directly, including various HAMAS institutions, including the ICSH.[41]

---

[41]    Even projects like the purchase of meals for the needy were often routed through local "businessmen" like Mustafa Saadi Abd El Fattah Sahl who, together with his brother, were both HAMAS operatives and owners of a grocery in the Hebron area.

272.    ICSH was declared to be an Unlawful Association by the Israeli Minister of Defense on February 25, 2002, and by the head of the IDF Central Command's Order on June 30, 2002.

273.    Qatar Charity also made transfers to the Jebaliya branch of the Islamic Society (Gaza), one of HAMAS's flagship institutions. On October 20, 2013, the Palestinian Information Center (www.palinfo.com), the official website of HAMAS's Political Bureau, published a story in which the Chairman of the Islamic Society in Jebaliya, Ramez al-Gharbawi, thanked Qatar Charity for its donation.

274.    Qatar Charity's own annual reports for the years 2013, 2014, and 2015 provide documentary evidence that Qatar Charity transferred substantial funds to, and implemented joint projects in partnership with, various HAMAS institutions, including Al-Ihsan in Hebron.

275.    Notwithstanding Qatar Charity's transparent and substantial connections to terrorist entities, BOP continued providing Qatar Charity with banking services that enabled these terrorism financing activities.

276.    Throughout the entire 2009-2015 period, Qatar Charity operated as a designated Unlawful Association in the Palestinian Territories. Consequently, Qatar Charity was explicitly banned from conducting any operations within Israel or the Palestinian Territories, but was not shuttered by the Palestinian Authority.

277.    Qatar Charity's illegal operations continued until July 2015, when Israel arrested three of Qatar Charity's senior executives in the Palestinian Territories: Fadi Mansra, Judeh Jamal, and Najwan Odeh.

278.    In December 20, 2016, HAMAS reported on its official Palestinian Information Center website that Israel had detained five employees of Qatar Charity's "Palestine branch" for allegations of working for a "banned organization."

279.    In 2017, Israeli courts convicted Judeh Jamal, who had served as Qatar Charity's Director, of operating an illegal organization and transferring funds to HAMAS. He served approximately 23 months in prison and received a fine of one million Israeli shekels.

280.    Najwan Odeh, who served as operations manager for Qatar Charity's Palestinian Territories operations, received a 17-month prison sentence and a 100,000-shekel fine after also being convicted of operating an illegal organization and transferring funds to HAMAS.

281.    Fadi Mansra, who worked in the accounts department for Qatar Charity, served approximately 2.5 years in an Israeli prison for his offenses. To secure Mansra's release from prison, Qatar's Foreign Ministry paid his one-million-shekel criminal fine.

282.    In fact, even Arab Bank, a major Jordanian financial institution with a history of financing HAMAS, refused to process salary payments that Qatar Charity attempted to make to its employees in the Palestinian Territories. Additionally, Banque du Caire, an Egyptian banking institution also operating in the Palestinian Territories, similarly refused to conduct any banking activities on behalf of Qatar Charity in the Palestinian Territories.

I.    **Bank of Palestine's Essential Role Processing and Laundering Qatar Charity's Terrorism Financing**

283.    In 2003, the Mossad's[42] Head of Counter-Terrorism Financing met personally in Israel with BOP's former Chairman of the Board, Dr. Hani Hashim Shawa, to warn BOP that it

---

[42]    The Mossad is Israel's equivalent to the Central Intelligence Agency.

needed to stop transferring funds from abroad to various HAMAS-controlled institutions because it was fueling terrorist attacks.

284.    The Mossad's Counter-Terrorism Financing efforts had led it to conclude that BOP was one of the primary banks in the Palestinian Territories used by HAMAS.

285.    Not coincidentally, BOP later became a primary conduit for Qatar Charity's systematic terrorism financing operations, providing crucial local banking infrastructure that enabled Qatar Charity to receive funds from Qatar and distribute those funds to HAMAS locally through its 46 branches in the Palestinian Territories.

286.    Throughout the period preceding and during the attacks at issue, BOP maintained and serviced multiple accounts in Qatar Charity's name. Through these accounts, BOP facilitated the receipt of wire transfers totaling tens of millions of dollars. These transfers originated with Qatar Charity in Doha and ultimately landed in Qatar Charity's accounts at BOP's branches in the Palestinian Territories.

287.    As discussed above, Qatar Charity sent funds from its Doha headquarters to its operations in the Palestinian Territories in euros—specifically, their accounts at the BOP, which then converted euros into dollars under its own name.

288.    As Qatar Charity executive Fadi Mansra explained to Israeli police: "At the bank branch in Ramallah, we convert the bills from euros to Dollars and this action is only done at the Bank of Palestine. This is the Qatar Organization's policy for all branches around the world."

289.    Qatar has no business rationale for transferring funds to the Palestinian Territories in euros. Qatar itself does not use euros—its own currency is the Qatari Riyal, although as an oil and natural gas-based economy, Qatar trades heavily in U.S. dollars (oil is traded globally in U.S. dollars, commonly called "petrodollars").

290. But euros have two important qualities: First, they are usually transferred through Europe, not the United States, and are thus subject to less scrutiny (especially relating to HAMAS). Second, they are highly liquid and thus easily convertible into U.S. dollars.

291. The Qatari Riyal, on the other hand, is not widely traded internationally outside the Persian Gulf region, making riyal-to-dollar conversions in the Palestinian Territories expensive, difficult to execute through normal foreign exchange markets, and likely to attract attention from compliance personnel in New York, where U.S. dollars are purchased, due to the unusual nature of such conversions.

292. However, transferring funds directly in U.S. dollars from Qatar to the Palestinian Territories would potentially have triggered red flags under U.S. anti-money laundering and counter-terrorism financing regulatory frameworks. Both Qatar and the Palestinian Territories are designated high-risk jurisdictions for terrorism financing; Qatar Charity itself was already designated a "priority III terrorism support entity" in the U.S. and a terror organization in Israel.

293. U.S. correspondent banks are required to screen transfers for potential connections to money laundering, terror financing, and other crimes. Thus, U.S. correspondent banks screening U.S. dollar-denominated funds transfers originating from Qatar Charity in Doha and destined for the Palestinian Territories would have run a greater risk of subjecting these transactions to intensive AML/CFT scrutiny.

294. BOP was able to convert Qatar Charity's euros to U.S. dollars without raising suspicions in the United States.

295. To do so, BOP used its U.S. dollar-denominated correspondent banking relationships with major New York banks. During all relevant times, BOP maintained U.S. dollar-

denominated correspondent accounts (nostro accounts) at correspondent banks that, in turn, maintained vostro accounts on their books reflecting BOP's U.S. dollar-denominated balances.

296.    BOP sold euros from its euro-denominated accounts (*i.e.*, likely through Germany) and purchased U.S. dollars through BOP's correspondent accounts in New York. These trades would likely have been made on BOP's own behalf, with no reason to alert any New York banks that the trades were for the benefit of Qatar Charity.

297.    Finally, BOP then processed Qatar Charity's transactions in Ramallah or Gaza using these U.S. dollars-denominated assets by sending them to HAMAS-controlled accounts or issuing Sanabel cards, as described herein.

298.    That it was participating in a money laundering scheme to evade counterterrorism laws would have been obvious to BOP, given the identity of its customer and the lack of a business rationale for the funds to arrive in euros when Qatar Charity also held U.S. dollar-denominated accounts and routinely made payments through those accounts — in dollars.

299.    Indeed, Defendants' scheme *cost* Qatar Charity money in additional SWIFT and conversion/reconversion fees and the risk spread between euros and dollars.

300.    BOP processed numerous incoming wire transfers for Qatar Charity from 2009 through 2015, with the transfers intensifying significantly prior to the attacks at issue when Qatar Charity moved $28 million to the Palestinian Territories.

301.    Without BOP's willingness to maintain Qatar Charity as a customer, Qatar Charity would have been unable to effectively receive and distribute the millions of dollars it was channeling to HAMAS and its operatives throughout the Palestinian Territories. BOP's provision of banking services constituted crucial and substantial assistance to Qatar Charity's terrorism financing activities and was essential to Qatar Charity's ability to finance HAMAS.

302.    BOP's role was particularly crucial because it provided Qatar Charity with access to the local Palestinian banking infrastructure that was necessary to distribute funds to HAMAS-controlled institutions and individual HAMAS terrorists and their families.

303.    Without a Palestinian bank willing to maintain accounts and process transactions, Qatar Charity could not have operated its financing network on the ground.

**J.    The Sanabel Card Scheme: Bank of Palestine's Direct Facilitation of Anonymous Terrorist Financing**

304.    BOP played a central, knowing, and active role in Qatar Charity's Sanabel Card scheme, providing anonymous, untraceable funding directly through the purchase of thousands of anonymous (U.S. dollar-denominated) stored value cards, known as "Sanabel Cards," issued by BOP.[43] These cards were specifically designed to be untraceable (like cash), with no documentation linking any particular card to any individual recipient.

305.    In consultation with HAMAS's ICSH and others, Qatar Charity then arranged for the distribution of these Sanabel Cards throughout the Palestinian Territories to thousands of recipients, including to HAMAS terrorists and their families.

306.    BOP knew that stored value cards were essentially the equivalent of cash and therefore untraceable and that the anonymity of the Sanabel Cards was essential to the scheme's effectiveness.

**K.    Bank of Palestine Maintained One or More Accounts for HAMAS's Al Nur Prisoners Society - Gaza**

307.    Al-Nur Society was established in 2000. Its headquarters were located in Gaza City. The society received its license from the Palestinian Interior Ministry. Its proclaimed activity

---

[43]    As of 2011, BOP was the sole card issuer and merchant acquirer of Visa and MasterCard in the Palestinian Territories and owns the largest card processing operations.

during the relevant period was to provide material and financial assistance to prisoners, their families, and martyrs' families.

308.    From its inception, Al-Nur Society has been a core HAMAS institution closely affiliated with the organization's terror apparatus, the Qassam Brigades.

309.    As a result of its activities and its organizational identification with HAMAS, Al-Nur Society was designated by the Israeli Defense Minister as an Unlawful Association on February 25, 2002, and by the Head of the IDF Central Command on June 30, 2002.

310.    In August 2003, the Palestinian Authority temporarily froze all of Al-Nur's bank accounts because of its affiliation with HAMAS.

311.    On February 25, 2004, IDF forces raided banks in Ramallah and confiscated funds from [bank] accounts of several societies that were identified with HAMAS and with Palestinian Islamic Jihad, including Al-Nur Society.

312.    In August 2005, the Palestinian Authority confiscated Al-Nur's bank account because of its affiliation with HAMAS.

313.    Al-Nur Society's seven co-founders, who also sat on its first managerial board, were all known as HAMAS activists. The Israeli security services found a list of their names in the possession of one of the co-founders, Riyad Hussein Abdallah Abu Zaid. The list included: Salah Shehada, co-founder of HAMAS, who headed its Qassam Brigades until his death in 2002, Mushir al-Masri, a HAMAS spokesman and senior leader of the organization, and Ahmad Ja'abri, who succeeded Shehada as head of HAMAS's Qassam Brigades until his death in 2012.

314.    Since at least 2014, BOP maintained one or more accounts for Al-Nur Society knowing that it was a core HAMAS institution.

315.    During the 2014-2015 period, Al-Nur Society used its account(s) at BOP to finance Qassam Brigades terror cells and terrorist attacks, including in the West Bank.

**L.    Bank of Palestine Maintained One or More Accounts for HAMAS's Canadian Fundraising Arm – IRFAN**

316.    The International Relief Fund for the Afflicted and Needy (IRFAN-Canada) described itself on its website as "an international relief and humanitarian, registered in Canada since 1998."

317.    In reality, it was the leading HAMAS fundraising organization in Canada.

318.    After HAMAS forcibly seized control of the Gaza Strip in 2007, IRFAN-Canada opened an office in Gaza, indicating a shift in its operational focus in favor of the HAMAS-controlled Gaza Strip.

319.    According to the Canadian government, IRFAN-Canada "partnered with organizations that, variously: are run by members of the Hamas government [in Gaza]; openly support and provide funding to Hamas; have been raided or listed as unlawful associations in Israel for affiliation to Hamas; or have had their bank accounts seized for connections to Hamas."

320.    In 2006, after HAMAS won the elections for the Palestine Legislative Council and gained temporary control of the Palestinian Authority, IRFAN opened an Israeli-shekel-denominated account with BOP which it immediately used to transfer $57,331 to the HAMAS-controlled Ministry of Telecommunications and Information Technology.

321.    Three days after this July 2006 transfer BOP required IRFAN-Canada to close the account.

322.    In October 2009, IRFAN-Canada's General Manager, Mr. Abdel-Majid, traveled to Qatar to meet with representatives of the Qatar Charity and other HAMAS fundraising organizations to discuss a partnership between them.

323.    In 2010, IRFAN-Canada opened a new office in Gaza that was managed by I'tidal al-Khatib, Executive Director of Ard El Insan (a HAMAS-affiliated institution in Gaza).

324.    Despite closing IRFAN-Canada's account after only three days in 2006, BOP allowed IRFAN-Canada to open a new account in April 2010 with al-Khatib as a signatory.

325.    On April 15, 2011, the *Toronto Star* reported that the Canada Revenue Agency (CRA) has announced that "IRFAN-Canada is an integral part of an international fundraising effort to support Hamas." IRFAN-Canada created promotional videos that the CRA said "demonize Israel, characterize the Arab-Israeli conflict as a religious war, appeal for all Arab and Muslim nations to join in the struggle against Israel and glorify martyrdom." The CRA announced its decision to revoke IRFAN's charitable status.

326.    According to the *Toronto Star*'s report, "The decision to revoke the group's status came after years of tax audits and litigation over its alleged ties to Hamas. An audit of the charity's 2002 fiscal year found that IRFAN-Canada 'maintained partnerships' with organizations that have direct ties to Hamas."

327.    These organizations included the Jenin Zakat Committee, the Tulkarem Zakat Committee and other HAMAS institutions.

328.    On April 24, 2014 Canada listed IRFAN as a terrorist organization, finding that:

> Between 2005 and 2009, IRFAN-Canada transferred approximately $14.6 million worth of resources to various organizations associated with Hamas, a listed terrorist entity under the Criminal Code. The law mandates severe penalties for persons and organizations that deal in the property or finances of a listed entity. In addition, it is a crime to knowingly participate in, or contribute to, any activity of a listed entity for the purpose of enhancing the ability of the entity to facilitate or carry out a terrorist activity. This offence and related offences are set out, in full, in the Criminal Code. The actions of IRFAN-Canada meet the legal threshold set out in the Criminal Code, which requires the existence of reasonable grounds to believe that the entity has knowingly participated in or facilitated a terrorist activity or is

knowingly acting on behalf of, at the direction of, or in association with such an entity.

**M.    Bank of Palestine's Violations of Banking Standards to Facilitate HAMAS Financing**

329.    Even apart from the multiple warnings BOP's former Chairman of the Board received over the years from a senior Israeli counterterrorism official that BOP needed to stop transferring funds from abroad to various HAMAS-controlled institutions, BOP had legal requirements to prevent terrorist financing.

330.    BOP systematically violated its legal obligations and international banking standards in its relationship with Qatar Charity. These violations were not isolated mistakes or compliance failures; they were part of a deliberate pattern of conduct designed to affirmatively assist Qatar Charity's terrorism financing.

331.    BOP purported to maintain AML/CFT, KYC, and due diligence procedures based on internationally recognized guidance that included:

- The Financial Action Task Force ("FATF") Forty Recommendations on Money Laundering and Special Recommendations on Terrorist Financing;

- The Basel Committee on Banking Supervision's principles and standards;

- The Wolfsberg Group's Anti-Money Laundering Principles and guidance; and

- The Egmont Group of Financial Intelligence Units standards.

332.    BOP's long-standing and extensive relationship with Qatar Charity was contrary to all the foregoing.

## CLAIM FOR RELIEF

## AIDING AND ABETTING DESIGNATED FOREIGN TERRORIST ORGANIZATIONS IN VIOLATION OF 18 U.S.C. § 2333(d)(2)

### (Against Qatar Charity and Bank of Palestine)

333.    Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

334.    Plaintiffs assert this cause of action against Defendants Qatar Charity and Bank of Palestine under 18 U.S.C. § 2333(d)(2), which provides for liability (in an action under 18 U.S.C. § 2333(a) involving acts of international terrorism by a designated Foreign Terrorist Organization), against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."

335.    Plaintiffs are nationals of the United States who were injured in their persons or property by acts of international terrorism, or the estates, survivors or heirs of such U.S. nationals.

336.    HAMAS was a designated FTO at the time it committed, planned, and/or authorized the attacks that injured and/or killed the Plaintiffs or their family members.

337.    The attacks at issue were acts of international terrorism as defined by 18 U.S.C. § 2331.

338.    Defendants Qatar Charity and BOP knowingly provided substantial assistance to HAMAS.

339.    Defendants Qatar Charity and BOP knowingly provided HAMAS substantial assistance which included: (a) significant amounts of money, (b) money laundering services to conceal terror financing, (c) untraceable cash (stored value) cards, and (d) access to U.S. dollar-denominated liquidity and the U.S. banking system, all of which was illegal and all of which could foreseeably be used to commit terrorist attacks.

340.    Qatar Charity provided massive financial support to HAMAS knowing it was a designated FTO committed to jihad and murdering civilians in Israel. It specifically laundered those funds to evade U.S. counterterrorism authorities. It distributed money to HAMAS institutions and in untraceable "Sanabel Cards" to HAMAS operatives and family members of HAMAS terrorists.

341.    BOP laundered Qatar Charity funds knowing they were intended for HAMAS, which it knew was a designated FTO committed to jihad and murdering civilians in Israel, and knowing that its laundering function was necessary to conceal those funds from U.S. counterterrorism authorities. BOP knowingly processed payments from Qatar Charity to HAMAS institutions and provided "Sanabel Cards" to Qatar Charity to distribute funds knowing that at least some of the money would go to HAMAS operatives and family members of HAMAS terrorists.

342.    At the time Defendants Qatar Charity and BOP provided substantial assistance to HAMAS, they knew that: (a) the U.S. government had designated HAMAS as an FTO and an SDGT; (b) HAMAS engaged in acts of international terrorism resulting in the murder of hundreds of Israeli and U.S. citizens; and (c) clandestine funding was essential to HAMAS's ability to perpetrate terrorist attacks.

343.    Defendants Qatar Charity and BOP also knew that the attacks at issue as well as Plaintiffs' injuries in the attacks, were foreseeable results of their substantial assistance to HAMAS.

344.    Given their knowing and substantial assistance to HAMAS, Qatar Charity and BOP demonstrated conscious, voluntary, and culpable participation in HAMAS's wrongdoing.

345.     Defendants Qatar Charity and BOP are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs for:

(a)     Compensatory damages in amounts to be determined at trial;

(b)     Treble damages pursuant to 18 U.S.C. § 2333(a);

(c)     Any and all costs sustained in connection with the prosecution of this action, including attorneys' fees pursuant to 18 U.S.C. § 2333(a); and

(d)     Such other and further relief as justice requires.


**OSEN LLC**

By: /s/ Gary M. Osen
        Gary M. Osen
        Ari Ungar
        Michael J. Radine
        Dina Gielchinsky
        Aaron Schlanger
        190 Moore Street, Suite 272
        Hackensack, NJ 07601
        Telephone: (201) 265-6400
        Facsimile: (201) 265-0303
        gosen@osenlaw.com
        aungar@osenlaw.com
        mradine@osenlaw.com
        dgielchinsky@osenlaw.com
        aschlanger@osenlaw.com

**STEIN MITCHELL BEATO & MISSNER LLP**
Jonathan E. Missner (motion for admission pro hac
vice forthcoming)
Robert B. Gilmore (motion for admission pro hac
vice forthcoming)
Kevin L. Attridge (motion for admission pro hac
vice forthcoming)
2000 K St., NW, Suite 600
Washington, D.C. 20006
Telephone: (202) 737-7777
Facsimile: (202) 296-8312
jmissner@steinmitchell.com
rgilmore@steinmitchell.com
kattridge@steinmitchell.com

**MM~LAW LLC**
Gavriel Mairone
980 North Michigan Avenue, Suite 1400
Chicago, IL 60611
Telephone: (312) 253-7444
Facsimile: (312) 275-8590
ctlaw@mm-law.com

*Attorneys for Plaintiffs*